**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 07-1600**

_____

JUAN ALTMAYER-PIZZORNO,

　　　　　　　Plaintiff - Appellee,

　　　v.

L-SOFT INTERNATIONAL, INCORPORATED,

　　　　　　　Defendant – Appellant,

　　　and

L-SOFT SWEDEN AB; L-SOFT INVESTMENTS, S.A.; L-SOFT UK LTD;
ERIC THOMAS,

　　　　　　　Defendants,

　　　and

DELOITTE & TOUCHE, LLP,

　　　　　　　Interested Party.

_____

**No. 07-1613**

_____

JUAN ALTMAYER-PIZZORNO,

　　　　　　　Plaintiff – Appellee,

　　　v.

ERIC THOMAS,

　　　　　　　Defendant – Appellant,

and

L-SOFT INTERNATIONAL, INCORPORATED; L-SOFT SWEDEN AB; L-SOFT INVESTMENTS, S.A.; L-SOFT UK LTD,

        Defendants,

    and

DELOITTE & TOUCHE, LLP,

        Interested Party.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, Senior District Judge. (8:02-cv-01556-PJM)

---

Argued: September 25, 2008        Decided: December 3, 2008

---

Before WILLIAMS, Chief Judge, GREGORY, Circuit Judge, and James C. CACHERIS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Chief Judge Williams and Senior Judge Cacheris joined.

---

**ARGUED:** Mark Thomas Stancil, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, L.L.P., Washington, D.C., for Appellants. Norman L. Smith, FISHER & WINNER, Baltimore, Maryland, for Appellee. **ON BRIEF:** Craig M. Palik, MCNAMEE, HOSEA, JERNIGAN & KIM, P.A., Greenbelt, Maryland, for Appellant Eric Thomas; Roy T. Englert, Jr., Ariel N. Lavinbuk, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, L.L.P., Washington, D.C., for Appellant L-Soft International, Incorporated. Jeffrey E. Nusinov, FISHER & WINNER, L.L.P., Baltimore, Maryland; Francis J. Gorman, Charles L. Simmons, GORMAN & WILLIAMS, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Juan Altmayer-Pizzorno ("Pizzorno") brought suit against L-Soft International, Inc. ("L-Soft"), and its CEO Eric Thomas ("Thomas"), alleging, inter alia, that L-Soft[1] breached the software distribution contract between the parties and engaged in copyright infringement through its continued software sales after the termination of the contract. A jury returned a verdict for Pizzorno on both of these claims. On appeal, L-Soft argues that the district court erred in denying its motion for judgment as a matter of law on the copyright infringement claim. For the reasons set forth below, we affirm the judgment of the district court.

I.

L-Soft is a software company whose premier product is an e-mail list management program known as LISTSERV. LISTSERV offers various functions related to e-mail list management, but the program does not actually send e-mail messages. In 1995, L-Soft came into contact with Pizzorno, a developer who had designed mailing software that was capable of quickly sending a large number of e-mail messages. The two parties discussed an

---

[1] Defendants L-Soft International, Inc., and Eric Thomas are hereinafter collectively referred to as "L-Soft."

arrangement in which L-Soft would market and sell licenses of Pizzorno's mailing software that were packaged along with LISTSERV. These negotiations culminated in an October 1995 contract between the parties, known as the Intellectual Property Distribution Agreement ("IPDA").

Under the terms of the IPDA, Pizzorno granted L-Soft the exclusive North American licensing rights to the mailing software, which was to be sold under the brand name LSMTP; in exchange, L-Soft was to pay Pizzorno twenty-five percent of the net proceeds from its sales of LSMTP. L-Soft also agreed to sell maintenance services for LSMTP, and Pizzorno was to provide support under the maintenance service contracts in exchange for eighty percent of the net proceeds from the service contracts. The payment schedule in the IPDA obligated L-Soft to make all royalty payments to Pizzorno on a quarterly basis.

In addition to the IPDA's licensing and royalty provisions, the contract included a non-competition covenant that prohibited L-Soft from developing any software that would be in direct competition with LSMTP and from contracting with a third party to develop competing software.[2] The IPDA also contained two

---

[2] Section 6.2 provides:

A software product shall be considered to qualify as Competing Software if, subject to the other limiting and defining provisions in this Article 6, the
(Continued)

4

provisions allowing for termination of the contract, one in the event of default and the other for voluntary termination. Under Section 5.2 of the IPDA, either party could terminate the contract if, after giving written notice to the other party that it had breached the terms of the IPDA, the breaching party "fail[ed] to correct, or commence and diligently pursue corrective action, within thirty days." (J.A. 100.) Under Section 5.4 of the IPDA, either party could voluntarily terminate the IPDA without cause; however, L-Soft had to give sixty days written notice, while Pizzorno was required to give eighteen months written notice. Furthermore, if Pizzorno elected to voluntarily terminate the IPDA, L-Soft would be immediately released from the non-competition covenant at the time that the notice of termination was given.

From 1993 until 1998, both parties performed in accordance with the IPDA. However, Pizzorno did not receive his royalty payment for the first quarter of 1999, which ended on April 30, 1999, and he sent Thomas correspondence by e-mail and registered

---

software product performs tasks substantially similar to the Software, such that a typical customer and user of the Software could be reasonably expected to switch from the Software to the new software product with negligible or at least acceptable loss in functionality and performance.

(J.A. 101.)

5

mail on May 25, 1999. In this correspondence, Pizzorno notified Thomas that L-Soft had failed to send him a royalty check for the first quarter of 1999 as required by the IPDA. Thomas responded to Pizzorno by e-mail, claiming that Pizzorno was himself in breach of the IPDA and disputing that L-Soft owed Pizzorno any royalties for the first quarter. L-Soft claimed that it had overpaid Pizzorno in prior quarters due to differences in accounting procedures.

On July 13, 1999, Pizzorno sent Thomas a letter ("the July 13th letter"), in which he stated:

> [O]n May 25th I sent you a letter, both per e-mail and on paper per registered mail, inquiring on the status of the 2nd quarter royalty payment, which was due by the end of April. You responded per e-mail saying that you were changing your accounting system and would pay once that had been done, but you never did. Certainly you realize that I have the right to be paid on time . . . I find it hard to believe that L-Soft owed me no money at all for that quarter. I wonder if you are still selling licenses of the program. As far as I can tell, by not paying me, you have breached the contract.
>
> I now consider the contract terminated, and unless you prove that L-Soft indeed owned [sic] me no money by the end of July, I will act accordingly. Thank you.

(J.A. 222 (ellipsis in original).)

On August 5, 1999, L-Soft sent a letter to Pizzorno in response to the July 13th letter. In this letter ("the August 5th letter"), L-Soft reiterated that it had not paid Pizzorno because of changes in its accounting procedures, and L-Soft

6

assured Pizzorno that he would be paid royalties in the future as soon as he was entitled to them. L-Soft further alleged that Pizzorno was in breach of the IPDA because he had failed to provide adequate technical support and failed to provide L-Soft a copy of the source code for the mailing software.

On August 25, 1999, Pizzorno sent a letter to L-Soft in response to the August 5th letter. In this letter ("the August 25th letter"), Pizzorno stated that he had initially sent notice of default on May 25, 1999, and after he received no payment or adequate explanation for nonpayment, he sent the July 13th letter terminating the agreement. The August 25th letter continued:

> Given the history of payments from L-Soft to Mr. Pizzorno pursuant to the Agreement, Mr. Pizzorno finds it difficult to believe that no payments were due for the first quarter. If indeed no payments were due, then this implies that L-Soft has defaulted on its obligations to use its best efforts to sell the Software . . . . In any event, empty statements that no royalties are due will not suffice. Until L-Soft provides an accounting, Mr. Pizzorno will continue to treat the Agreement as terminated.

(J.A. 231.) The August 25th letter also addressed L-Soft's contention that Pizzorno had breached the IPDA by failing to provide the source code for the mailing software, stating that Pizzorno "has elected the escrow option" and "is prepared" to transmit the source code directly to the licensees. (J.A. 231-32.) Pizzorno further charged L-Soft with several additional

7

breaches of the IPDA, including: (1) failing to make second quarter royalty payments, (2) failing to use best efforts in marketing LSMTP, and (3) using LSMTP in a manner not permitted by the IPDA. Pizzorno demanded that L-Soft cure these breaches within thirty days.

Pizzorno next communicated with L-Soft via two e-mails sent on September 10, 1999. In the first e-mail, Pizzorno contacted Thomas regarding Pizzorno's failure to provide support services for the mailing software:

> [A]s I and my attorney have indicated, we consider the Agreement terminated. Accordingly, I am no longer providing support services. If L-Soft 1) persuades me that no royalties were due the first quarter, and 2) cures the breaches described in my attorney's most recent letter, I will resume support. Until then, I will forward all "help" messages to you . . . .

> This of course ignores the problem that L-Soft continues to use LSMTP despite the termination of the Agreement. I will not ignore that for long.

(J.A. 237.) Pizzorno wrote the second e-mail in response to a support request from an L-Soft employee. In that e-mail, Pizzorno told the employee that L-Soft and he were "in the middle of a contract dispute, and unless and until L-Soft resolves this dispute I will not be supporting LSMTP further." (J.A. 253.) Pizzorno did answer the question, however, "as a courtesy, and without waiving any of my rights regarding the contract dispute." (Id.)

8

On September 27, 1999, L-Soft responded to the August 25th letter. In this letter (the "September 27th letter"), L-Soft acknowledged that Pizzorno had made allegations that L-Soft was in default of the contract, but it denied those allegations. In addition, the September 27th letter followed up on Pizzorno's failure to provide the source code for the mailing software. Pizzorno ultimately placed the source code into escrow in October 1999. The parties had no communications with each other from September 27, 1999, until the filing of this lawsuit; however, L-Soft continued to sublicense LSMTP and made no royalty payments to Pizzorno.

On April 29, 2002, Pizzorno brought suit against L-Soft in the United States District Court for the District of Maryland for breach of contract and copyright infringement.[3] L-Soft filed a counterclaim against Pizzorno for breach of contract. The jury returned a verdict in favor of Pizzorno, specifying in the verdict form that L-Soft had breached the IPDA on April 30, 1999, and that Pizzorno had not breached the IPDA. The jury also determined that Pizzorno had terminated the agreement on

---

[3] Because L-Soft continued to sell LSMTP licenses after the lawsuit was filed, Pizzorno sent a notice of voluntary termination to L-Soft on December 16, 2003, which was "given in addition to my previous notices of termination" and "without prejudice to my termination of the Agreement in 1999 for cause." (J.A. 743.)

July 13, 1999, and that L-Soft was liable for copyright infringement for all LSMTP sales occurring thereafter.

Following the verdict, L-Soft raised and renewed several motions for judgment as a matter of law, two of which are relevant to this appeal:  (1) that the July 13th letter was insufficient to terminate the IPDA, and (2) that the misuse of copyright defense precluded Pizzorno from recovering on the copyright infringement claim.  The district court denied both post-trial motions and entered judgment for Pizzorno.  L-Soft appeals.


II.

We review de novo the district court's denial of a motion for judgment as a matter of law.  Int'l Ground Transp., Inc. v. Mayor of Ocean City, 475 F.3d 214, 218 (4th Cir. 2007).  A district court should grant a motion for judgment as a matter of law after the jury verdict "only if, viewing the evidence in a light most favorable to the non-moving party . . . and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party."  Id. at 218-19.

In deciding upon the applicability of an equitable defense such as misuse of copyright, a district court must accept the factual findings of the jury if they are supported by

10

substantial evidence. See Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1579 (Fed. Cir. 1997). If the district court makes its own factual findings in determining the applicability of an equitable defense, we must uphold such findings unless they are clearly erroneous. See id. at 1579 n.3; Newell Cos., Inc. v. Kenney Mfg. Co., 864 F.2d 757, 762 (Fed. Cir. 1988).

## A.

In order to terminate a contract, one party must give the other party a notice of termination that is "definite, specific, positive, and unconditional." C.W. Blomquist & Co., Inc. v. Capital Area Realty Investors Corp., 311 A.2d 787, 791 (Md. 1973); accord City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1327 (4th Cir. 1978). Written notice of termination is not required; rather, a contract may be terminated through conduct that is clearly inconsistent with the continued existence of the contract. Buchholtz v. Bert Goodman Signs, Inc., 199 A.2d 915, 917 (Md. 1964). Nevertheless, even where a contract is terminated or abandoned through the conduct of both parties, such termination must be shown by "positive and unequivocal conduct inconsistent with an intent to be bound." Graham v. James, 144 F.3d 229, 238 (2d Cir. 1998); see also

11

Buchholtz, 199 A.2d at 917-18 (applying the "unequivocal" standard where the conduct of both parties was at issue).[4]

First, L-Soft argues that the district court misconceived the legal standard for determining whether a contract has been terminated. According to L-Soft, the district court should have determined for itself whether the July 13th letter was ambiguous on its face, rather than merely "conclude[] that the jury could well conclude that the letter was not ambiguous." (J.A. 1660.) L-Soft bases this argument on the familiar proposition that "the determination of ambiguity is one of law, not fact." Calomiris v. Woods, 727 A.2d 358, 362 (Md. 1999). However, Calomiris is a case regarding the interpretation of the terms of a written contract, not a case about whether a written notice constituted an effective termination of a contract. See id. In deciding whether a contract was terminated, it is unnecessary for the court to initially determine whether a written notice of termination was "ambiguous" as is done for cases involving contract interpretation. The legal standard for contract termination permits the trier of fact to consider any written

_____

[4] The district court suggested that there may be a lower standard for determining whether there has been an effective contract termination when both parties act as if the contract is terminated. (J.A. 1661.) While the district court was incorrect as a matter of law, it did not actually apply a lower standard in making its decision, and thus this error does not merit reversal.

12

documents, the conduct of the parties, and surrounding circumstances to determine whether the notice of termination was positive and unconditional. See Buchholtz, 199 A.2d at 917. A fair reading of the district court's opinion reveals that the district court acknowledged that the notice of termination had to meet the positive and unconditional standard, and it held that a reasonable jury could have concluded that the July 13th letter and the prior conduct of the parties satisfied that standard.

Nevertheless, L-Soft argues that even if the district court applied the correct legal standard for contract termination, the July 13th letter was legally insufficient to satisfy this standard. Under some circumstances, courts have determined that particular written documents did not satisfy the standard for termination as a matter of law. See, e.g., Stovall v. Publishers Paper Co., 584 P.2d 1375, 1381 (Or. 1978); Rosenbloom v. Feiler, 431 A.2d 102, 111 (Md. 1981); Accu-Weather, Inc. v. Prospect Commc'ns, Inc., 644 A.2d 1251, 1255 (Pa. Super. Ct. 1994). L-Soft argues that the July 13th letter is similar to the purported written notice of termination at issue in Stovall, which the Supreme Court of Oregon determined was legally insufficient to constitute an effective notice of termination. In Stovall, the plaintiff's counsel sent a letter to the defendant's counsel as part of an ongoing dispute about the

13

construction of a road that was part of a timber contract. See
584 P.2d at 1377. In the first two paragraphs of the letter,
the plaintiff's counsel ostensibly terminated the contract,
stating that:

> We are giving you notice herewith that pursuant to
> Paragraph 11 of the contract we are exercising Mr.
> Stovall's option to terminate the Timber Cutting
> Agreement and all rights thereunder of your client and
> of their predecessor in interest. The cutting of any
> timber will be considered willful trespass and treble
> damages will be sought under ORS 105.810.

Id. at 1378.

In the third paragraph of the letter, the plaintiff's
counsel first stated that he "was prepared to file [an] action
several days ago," and he even included a copy of the complaint
with the letter. Id. However, the plaintiff's counsel
indicated that he and the plaintiff had "reexamined" a prior
letter of the defendant and that "it would appear that in the
interest of compromise [the defendant] is offering to do
substantially more than it has previously acknowledged to be its
obligation . . . ." Id. The letter then suggested a compromise
to the ongoing dispute between the parties and indicated that if
the compromise was not accepted by written notice within a week,
the plaintiff would file a complaint thereafter. Id. at 1378-
79. The plaintiff's counsel concluded the letter with a related
proposal, which the defendant should consider "if [the

14

defendant] accepts the compromise offer and will be logging in the area." Id.

Ultimately, the Stovall court found that the letter was an ineffective notice of termination as a matter of law. See id. at 1379-80. According to the court, when a letter "mix[es] words of termination with words of compromise, negotiations, and present obligation," such a letter fails to satisfy the requirements for an effective termination. Id. at 1380. Even though the first two paragraphs of the letter seemed to contain clear, unequivocal language of termination, the remainder of the letter contained an extensive "offer of compromise," raising doubts as to whether the plaintiff had terminated the contract. Id. at 1379-80. Throughout the second half of the letter, the plaintiff's counsel referred to present contractual obligations, which would presumably continue if the defendant were to accept the plaintiff's compromise offer within a week. See id.

Although L-Soft contends that the July 13th letter is similar to the letter at issue in Stovall, the two letters are in fact quite distinct with regard to the termination of the respective contracts. In the first paragraph of the July 13th letter, Pizzorno stated that he had sent a letter to Thomas on May 25, 1999, inquiring about the royalty payment, but that he had not received any payment nor been provided with a sufficient explanation for non-payment. Pizzorno concluded the paragraph

15

by stating, "As far as I can tell, by not paying me, you have breached the contract." (J.A. 222.) According to L-Soft, the last sentence of the first paragraph was equivocal because Pizzorno admitted that he lacked complete information about whether L-Soft had breached the IPDA.

The last sentence of the first paragraph should not be read in isolation, as L-Soft suggests, but rather it must be considered in the context of the circumstances of the parties. Pizzorno had no way of knowing the precise amount of royalty payments that were due since he was not involved in the sales of the LSMTP software; all such information was held exclusively by L-Soft. The use of the phrase "[a]s far as I can tell" did not imply any equivocation in Pizzorno's termination of the IPDA, but merely reflected the fact that Pizzorno had no way of verifying the amount of royalty payments he was owed.

In the second paragraph of the letter, Pizzorno wrote, "I now consider the contract terminated, and unless you prove that L-Soft indeed owned [sic] me no money by the end of July, I will act accordingly." (J.A. 222 (emphasis added).) L-Soft contends that this language is similar to that of the letter in Stovall because it ostensibly terminated the IPDA but also provided a condition that L-Soft could satisfy to prevent the termination of the contract. In response, Pizzorno claims that this paragraph clearly terminates the IPDA, and that a reasonable

16

jury could conclude that the second clause merely gave L-Soft a deadline to provide proof that no money was owed or else a lawsuit would be filed to collect monies owed.

While the second paragraph of the July 13th letter might not have been written using precise legal terminology, the language is unlike the attempt to negotiate a compromise in the Stovall letter. Although L-Soft contends that the phrase "act accordingly" could have a variety of meanings, a reasonable jury could have found that Pizzorno used the phrase "act accordingly" to indicate that he would seek damages for breach of contract through the filing of a lawsuit. Even if the import of the "act accordingly" language could not be precisely deduced, a reasonable jury could have concluded that "act accordingly" clearly did not refer to the termination of the contract, particularly since Pizzorno had already stated that the contract was terminated in the first clause of the sentence and used the conjunction "and" to connect the two clauses.

Finally, L-Soft urges this court to consider Pizzorno's conduct following the receipt of the July 13th letter, which it claims is inconsistent with the termination of the IPDA on July 13, 1999, including: (1) the August 25th letter, in which Pizzorno provided a list of L-Soft's breaches of the IPDA; (2) the September 10th e-mail to Thomas, in which Pizzorno stated that he would resume support if Thomas cured the breaches of the

17

IPDA; (3) the placement of the LSMTP source code into escrow on October 1999; and (4) the termination of the IPDA on December 16, 2003, pursuant to the voluntary termination provision.

Even assuming that Pizzorno's conduct following July 13, 1999, was inconsistent with the termination of the contract, such conduct cannot "revive" a contract that has been terminated. Courts have noted that the "conduct between the giving of notice and the actual date of termination[] may be considered in determining whether there has been a clear and unequivocal termination." Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003); accord Maloney v. Madrid Motor Corp., 122 A.2d 694, 696 (Pa. 1956); Accu-Weather, Inc., 644 A.2d at 1254-55. However, in those cases in which courts have considered a party's conduct subsequent to a purported notice of termination, the contract had not been immediately terminated in the written notice; rather, notice had been given for the contract to be terminated on some future date. See, e.g., Accu-Weather, Inc., 644 A.2d at 1254-55; Morris Silverman Mgmt. Corp., 284 F. Supp. 2d at 975. Here, the conduct at issue followed a notice of immediate termination, and thus it is of no moment for purposes of determining whether Pizzorno terminated the IPDA on July 13, 1999.

Since a reasonable juror could have concluded that the IPDA was terminated on July 13, 1999, based on the July 13th letter, the prior conduct of the parties, and the surrounding circumstances, the district court did not err in denying L-Soft's motion for judgment as a matter of law as to this issue.

B.

L-Soft further contends that Pizzorno should not recover on his copyright infringement claim because the inclusion of the non-competition covenant in the IPDA constituted a misuse of copyright. The Fourth Circuit expressly recognizes misuse of copyright as an equitable defense to a suit for copyright infringement, first applying the defense in Lasercomb America, Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990). The misuse of copyright defense is analogous to the misuse of patent defense, as both forbid the holder from using the copyright or patent "'to secure an exclusive right or limited monopoly not granted by the [Copyright or Patent] Office and which it is contrary to public policy to grant.'" Id. at 977 (quoting Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 492 (1942)). Specifically, the misuse of copyright defense precludes a copyright holder from recovering for copyright infringement where the holder has "attempt[ed] to suppress any attempt by the licensee to independently implement the idea which [the copyrighted material] expresses." Id. at 978.

19

In Lasercomb America, the plaintiff developed computer die-making software for which it obtained a copyright, and it licensed the software to the defendant and others. Id. at 971-72. The plaintiff included anti-competitive terms in its standard licensing agreement, which forbade the licensees' "directors, officers and employees, directly or indirectly, to write, develop, produce or sell computer assisted die making software." Id. at 973. Because of an oversight, the defendant did not sign the licensing agreement and thus was not bound by the anti-competitive terms. Id. Despite the fact that the defendant was not subject to the terms of the licensing agreement, this Court found that the defendant could avail itself of the misuse of copyright defense. See id. at 979.

Although Lasercomb America recognized the existence of the misuse of copyright defense, the decision also acknowledged that a copyright holder who had misused a copyright was not forever barred from bringing a suit for infringement. Instead, the copyright holder "is free to bring a suit for infringement once it has purged itself of the misuse." Id. at 979 n.22 (citing U.S. Gypsum Co. v. Nat'l Gypsum Co., 352 U.S. 457, 465 (1957)). Although the Lasercomb America decision did not elaborate on what standards should be used to determine whether copyright misuse has been purged, the misuse of patent defense has a well-established body of law upon which to draw. See id. at 973-74

20

(drawing upon the misuse of patent defense in recognizing the misuse of copyright defense).  Therefore, we hold that in order for a court to find that there has been a purge of copyright misuse, the copyright holder must show that "the improper practice has been abandoned and that the consequences of the misuse of the [copyright] have been dissipated."  Morton Salt Co., 314 U.S. at 493; accord U.S. Gypsum Co., 352 U.S. at 474.

Even though the burden is on the copyright holder to demonstrate that the misuse has been purged, cf. B.B. Chem. Co. v. Ellis, 314 U.S. 495, 498 (1942), the copyright holder is not required to prove that the consequences of the misuse have dissipated unless the defendant first shows that the misuse had anti-competitive consequences.  Cf. U.S. Gypsum Co., 352 U.S. at 465 (finding that the district court erred in holding that the patent misuse had not been purged because the record contained no facts about the consequences of the misuse); White Cap Co. v. Owens-Ill. Glass Co., 203 F.2d 694, 698 (6th Cir. 1953) (stating in a patent misuse case that "it was unnecessary for the plaintiff to prove that the consequences of the misuse had been dissipated because it was not shown that the misuse had illegal consequences").  If the defendant fails to show that the misuse had anti-competitive consequences, the termination of the contract containing the anti-competitive clause may be sufficient to purge the misuse.  Cf. White Cap Co., 203 F.2d at

21

698; <u>Ansul Co. v. Uniroyal, Inc.</u>, 306 F. Supp. 541, 560 (S.D.N.Y. 1969), <u>aff'd & modified</u>, 448 F.2d 872 (2d Cir. 1971), <u>cert. denied</u>, 404 U.S. 1018 (1972) ("What conduct constitutes a 'purge' depends upon the nature and extent of the misuse. Where the misuse consists of the insertion of an objectionable provision in a contract, the patentee's cancellation and abandonment of the clause may be sufficient.").

On appeal, L-Soft argues that the district court erred in refusing to apply the misuse of copyright defense. In particular, L-Soft contends that the non-competition covenant of the IPDA prohibited L-Soft from developing or contracting for the development of mailing software having functions similar to those of LSMTP and that these restrictions constituted a misuse of copyright. On the other hand, Pizzorno argues that the non-competition covenant was different from the standard licensing agreement at issue in <u>Lasercomb America</u> in that: (1) the non-competition covenant was part of a single contract between the parties instead of a standard restriction imposed on multiple licensees; and (2) the non-competition covenant bound only L-Soft and not its officers, directors, or affiliate companies, and thus the non-competition covenant did not have any actual anti-competitive effects on L-Soft. Alternatively, Pizzorno argues that even if the inclusion of the non-competition

22

covenant was a misuse of copyright, any misuse was purged by the termination of the IPDA.[5]

The district court found that L-Soft could not avail itself of the misuse of copyright defense, both because the facts of the present case did not "quite have the same flavor" as those in Lasercomb America and because any misuse was purged by Pizzorno's termination of the IPDA. (J.A. 1700.) We do not need to decide whether the inclusion of the non-competition covenant was a misuse of copyright, for even assuming that it was a misuse of copyright, the misuse was purged at the time that Pizzorno terminated the IPDA.

With respect to the district court's determination that any misuse of copyright had been purged, the district court first found that Pizzorno had abandoned the improper practice constituting misuse when he terminated the IPDA on July 13, 1999. In making this determination, the district court accepted the jury's finding that Pizzorno had terminated the IPDA on that date. The district court was bound to accept the jury's finding provided that the finding was supported by substantial evidence,

---

[5] Pizzorno also argues that L-Soft should be precluded from raising the misuse of copyright defense on the grounds of waiver and unclean hands. Because we affirm the decision of the district court on other grounds, it is unnecessary to address these alternate grounds.

and the substance of the July 13th letter and the prior conduct of the parties supported such a finding.

L-Soft next contends that the district court erred in finding that any anti-competitive consequences of the misuse had dissipated at the time that Pizzorno terminated the IPDA. Specifically, L-Soft argues that it met its initial burden of providing evidence that the copyright misuse had anti-competitive effects and that Pizzorno failed to produce any evidence that those consequences had dissipated. L-Soft primarily relies on Section 5.4 of the IPDA, the voluntary termination provision, as evidence that the non-competition covenant had anti-competitive consequences outlasting the existence of the IPDA. According to L-Soft, since Section 5.4 required that Pizzorno give eighteen months notice if he wished to voluntarily terminate the agreement and released L-Soft from the non-competition covenant if such notice was given, the provision demonstrates that L-Soft would need at least eighteen months after the expiration of the non-competition covenant to develop competing software.

L-Soft's reliance on the voluntary termination provision as evidence of the anti-competitive effects of the non-competition covenant is misplaced. The jury found that Pizzorno did not terminate the IPDA pursuant to the voluntary termination provision, but rather pursuant to the provision allowing for

24

termination in the event of default, and the latter provision provided no comparable eighteen-month window for L-Soft to begin development of competing software. More importantly, this type of contractual provision represents nothing more than a bargain reached between the parties, and it is certainly not the type of concrete evidence of anti-competitive effects that must be produced by L-Soft. The Supreme Court's decision in United States Gypsum Co. is instructive in this regard, as it found that the district court erred in holding that an unpurged misuse had been shown where "the record is barren of any facts with respect to the situation existing in the gypsum industry since 1941." 352 U.S. at 465. Similarly, L-Soft did not provide any evidence regarding the market for mailing software around the time of the termination of the IPDA, so it did not meet its initial burden of showing the existence of anti-competitive effects resulting from the inclusion of the non-competition covenant.

Assuming arguendo that L-Soft provided evidence of anti-competitive consequences stemming from the copyright misuse, the district court did not clearly err in finding that those consequences dissipated upon the termination of the IPDA. Given the circumstances of this case, the district court could have found that at the time of the termination of the IPDA, L-Soft was free to immediately begin development of a competing

product.  Furthermore, the non-competition covenant of the IPDA did not prohibit L-Soft from purchasing a competing software product from another company, only from contracting for its development.  Thus, L-Soft would have been able to immediately license competing software from another company upon the termination of the IPDA.

Because L-Soft failed to meet its burden of providing evidence that the inclusion of the non-competition covenant had anti-competitive effects, the district court did not err in refusing to apply the misuse of copyright defense.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED