**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 22-1271**

—————————

WALL RECYCLING, LLC,

Plaintiff − Appellant,

v.

3TEK GLOBAL, LLC,

Defendant – Appellee.

—————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, District Judge.  (1:20−cv−00371−TDS−JLW)

—————————

Argued:  January 26, 2024                          Decided:  July 31, 2024

—————————

Before DIAZ, Chief Judge, KING and HEYTENS, Circuit Judges.

—————————

Affirmed by unpublished opinion.  Chief Judge Diaz wrote the opinion in which Judge King and Judge Heytens joined.

—————————

**ARGUED:**   Keith P. Anthony, MORNINGSTAR LAW GROUP, Durham, North Carolina, for Appellant.  Ryan Kent McComber, FIGARI + DAVENPORT, LLP, Dallas, Texas, for Appellee.  **ON BRIEF:**   William J. Brian, Jr., Matthew J. Limoli, MORNINGSTAR LAW GROUP, Durham, North Carolina, for Appellant.  Mark A. Michael, HEDRICK GARDNER KINCHELOE & GAROFALO, LLP, Charlotte, North Carolina; Timothy A. Daniels, FIGARI + DAVENPORT, LLP, Dallas, Texas, for Appellee.

—————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Chief Judge:

Wall Recycling, LLC, and 3TEK Global, LLC, entered a contract for the sale of a scrap-metal shredder. The contract conditioned the sale on Wall's paying a deposit and executing a sales contract. Wall satisfied the former condition, but not the latter, and 3TEK later accepted Wall's request to cancel the contract.

Wall, however, believed that the contract remained in force because 3TEK never refunded Wall's deposit and the parties resumed discussions about Wall's buying a shredder. When 3TEK ultimately declined to sell Wall a shredder, Wall sued.

The district court granted summary judgment for 3TEK. It held that the parties' agreement wasn't enforceable because Wall never signed the associated sales contract, and 3TEK didn't waive that condition. Alternatively, the court concluded that the parties mutually rescinded their agreement. We affirm on both grounds.

I.

A.

Wall, a North Carolina-based company, operates scrap yards, and 3TEK, a Texas-based company, manufactures scrap processing equipment. In February 2019, Wall and 3TEK signed an agreement that provided Wall the option to buy two NEXT 6280 shredders

3

and a downstream sorting system[1] ("February Agreement"). The February Agreement listed a "quote" of $2,299,500 for one shredder system plus assembly costs.

At the time, 3TEK was manufacturing the first shredder in a production series of NEXT 6280 shredders. The February Agreement predicted that the next shredder would be available in July 2019. Wall paid $100,000 to secure a right of first refusal for the second and sixth production slots. But to "secure [a] machine and insure [sic] delivery commitment," the February Agreement required a 20% deposit (which the $100,000 would go toward) and a "signed order." J.A. 2086.

The February Agreement specified how Wall could exercise its right of first refusal and secure a machine:

> If 3TEK receives a signed Sales Contract with deposit from another customer, we will extend to [Wall] seventy-two (72) hours to determine your course of action. If for example you elect to take the second slot, then 1.) Signing of the 3TEK Sales Contract will be required; 2.) Payment of the balance of the initial 20% will be due and payable; and 3.) A finalized ready to ship date from 3TEK will be pledged. If you elect to pass, then your name will be attached to the next machine.

> If a Sales Contract is not signed and executed with 20% down by [Wall], First Right of Refusal Offer for machine production slots expires at the end of 2019 at the prices shown.

J.A. 2087.

On April 18, Bill Padula, 3TEK's Vice President of Sales, informed Dan Wall ("Dan"), Wall's owner, that the customer holding the third production slot paid its deposit,

---

[1] The NEXT 6280 is a large industrial shredder that breaks down complex machines, such as automobiles and appliances, into their component materials. The downstream system magnetically separates out certain metals that can be sold for profit.

4

and therefore, Wall could exercise its right of first refusal by "1.) Wiring the balance of [its] 20% by end of business (72 hours) day (5:00 pm EST) April 22nd, and 2.) Signing the attached 3TEK Sales Contract." J.A. 2098. If Wall did so, then Padula said that "3TEK will pledge a firm shipment date in September 2019." J.A. 2098. But if not, then the other customer would get the machine in the second slot.

Dan was unhappy about the September shipping date, as the February Agreement estimated one in July. To receive certain tax benefits, Dan needed the machine up and running before the end of 2019. But according to Dan, Padula told him that 3TEK would provide a 10% discount if the machine wasn't delivered by year's end. So the next day, Wall sought to exercise its right of first refusal. R.J. Smith, Wall's Chief Financial Officer, wired the balance of the 20% deposit. But Wall didn't sign (and thus didn't execute) the sales contract. Instead, Smith emailed redline edits to the contract, including a 10% penalty provision for late delivery, to Padula and Matt Morrison, 3TEK's President.

A few days later, Padula asked Smith to call him to discuss the proposed edits. Smith didn't, and Wall neither executed nor further discussed the sales contract with 3TEK.

On May 30, Padula emailed Smith to "follow[] up on this loose end wanting to get this document signed as we move closer." J.A. 872. Padula said that their "intentions are not that far apart" and that 3TEK would agree to the 10% penalty "as long as you take responsibility for timely completion on your responsibilities to insure [sic] a timely installation." J.A. 872. Smith agreed that they "were very close to agreement" and promised to reply after talking to Dan. J.A. 442.

5

But Smith never did, and again, Wall neither executed nor further discussed the sales contract with 3TEK.

## B.

Over the next several months, Padula informed Dan of various production delays. Concerned about the delays, Dan emailed Padula in early October to request Wall's "deposit back in full." J.A. 2159. Dan thought 3TEK was "making a great machine" and vouched to "keep [them] in mind for the future." J.A. 2159. But Dan couldn't "afford to wait any longer." J.A. 2159. So he concluded, "Please get me in touch with the appropriate person and I will provide my wiring instructions." J.A. 2159.

Morrison responded, "3TEK regretfully accepts your request to cancel the [February Agreement]. . . . 3TEK will reimburse the deposits made toward this purchase totaling $459,900.00." J.A. 2160. Morrison then explained that 3TEK couldn't refund the full deposit until it received a replacement order, but that it would transfer $100,000 immediately "once wiring instructions are confirmed." J.A. 2160.

Dan didn't respond, and Wall never provided wiring instructions. Believing that the February Agreement was cancelled, 3TEK moved the buyer in the third production slot to the second.

## C.

Soon after this email exchange, Dan met Jonathan Maly, a sales representative for 3TEK's parent company, at an industry conference and spoke to him about Wall's still buying a shredder. Once Maly promised to communicate with Dan and provide production updates, Dan agreed to move forward with a purchase.

6

The parties dispute the effect of that conversation. Wall insists that it withdrew its refund request and that the parties revived the February Agreement. 3TEK, on the other hand, claims that any discussions with Maly were about entering a new purchase agreement.

In mid-November, Maly emailed Dan, "Can you send me an email stating that you are still intent on moving forward with the purchase of a [NEXT] 6280 that is being manufactured by the end of the year[?] The last communication that we have record of was that of the refund for the deposit." J.A. 2527. Dan asked about the expected delivery date, and Maly told him January. But Dan never confirmed Wall's intent to move forward with the sale.

Still, Dan and Maly kept talking. In early December, Maly texted, "To protect you why dont [sic] I come down the week of December 16th and we sign a commitment that we have to pay a penalty if we dont [sic] deliver in January!" J.A. 2531. A week later, he texted, "Dan can we get a contract signed? More for your protection than [3TEK's]." J.A. 2534. Dan didn't respond to either message.

Maly then told Dan that the machine wouldn't be ready by year's end. Maly offered a $15,000 parts credit for the delay, and Dan proposed that 3TEK also cover the assembly costs. At the end of December, Dan asked for the new delivery date, to which Maly responded, "Shipping to you on the 24th of January." J.A. 49.

That date came and went without delivery. Then, in early February 2020, Padula and Maly visited Wall's facility to discuss delivery. The parties dispute whether they discussed signing a sales contract during this visit. But in mid-February, Maly emailed

7

Dan "the updated contract" and asked him to return a signed copy that week. J.A. 2536. That contract resembled the February Agreement, but it pledged a shipping date of February 28, 2020, and waived the assembly fee. It didn't include the 10% penalty or $15,000 parts credit that the parties discussed.

That day, Dan learned that Wall would be receiving the shredder in the third production slot, not the second, which he believed violated the February Agreement. Maly explained that Wall "lost [its] spot in line" when Dan requested to cancel that Agreement in October 2019, and 3TEK accepted that request. J.A. 2182. So "to make this relationship work" going forward, Maly said that Wall needed to sign the new sales contract and pay a deposit. J.A. 2182.

A few days later, Nancy Wall ("Nancy"), Wall's counsel, emailed 3TEK to propose three amendments to it: (1) a 10% penalty for not delivering by the end of 2019, (2) free assembly, and (3) the parts credit. Morrison asked Nancy to confirm that 3TEK and Wall hadn't executed a sales contract. Nancy replied, "There is no 'Sales Agreement' signed; there is a 'Sales Quote' signed." J.A. 2559.

At the end of February, 3TEK sent a letter rejecting Wall's three requests, which 3TEK had interpreted as an "offer" to buy a shredder. J.A. 2344. 3TEK explained that the February Agreement wasn't in effect because Wall never executed a sales contract and cancelled the Agreement in October 2019. And 3TEK said that the terms of Wall's offer were "unacceptable." J.A. 2344. So 3TEK refunded Wall's deposit plus interest.

8

D.

Wall sued 3TEK for breach of contract in North Carolina state court. Wall claimed that 3TEK breached the February Agreement by (1) failing to deliver the shredder by the promised dates; (2) delivering the shredder in the second production slot to another customer; and (3) repudiating its obligation to sell Wall a shredder.

3TEK removed the action to federal court based on diversity jurisdiction, and the district court granted summary judgment in its favor.

The court held that the February Agreement wasn't an enforceable contract for the purchase of a shredder because Wall never executed the sales contract. And it rejected Wall's argument that 3TEK waived this condition. Alternatively, the court held that the parties mutually rescinded the February Agreement in October 2019 and never revived it.

This appeal followed.

II.

We review a district court's grant of summary judgment de novo, viewing the facts and drawing inferences in the light most favorable to the nonmoving party. *Matherly v. Andrews*, 859 F.3d 264, 278 (4th Cir. 2017). Summary judgment is warranted when there's "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 279 (quoting *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016)).

Wall challenges the district court's grant of summary of judgment for 3TEK on two grounds. First, Wall contends that the court erred in holding that 3TEK didn't waive the

9

sales contract condition. Second, Wall argues that the court erred in holding that the parties mutually rescinded the February Agreement. We address each of these arguments below, beginning with the latter.

## A.

Wall claims that the parties didn't mutually rescind the February Agreement because they didn't agree on when 3TEK would return Wall's deposit. Alternatively, Wall argues that any mutual rescission was retracted when 3TEK didn't return the deposit and the parties moved forward with the sale. We disagree on both fronts.

### 1.

In North Carolina, a contract may be rescinded by "mutual agreement."[2] *Top Line Const. Co. v. J.W. Cook & Sons, Inc.*, 455 S.E.2d 463, 466 (N.C. Ct. App. 1995) (citing *Brannock v. Fletcher*, 155 S.E.2d 532, 542 (N.C. 1967)). Rescission requires a "meeting of the minds" and sufficient consideration. *Corbin v. Langdon*, 208 S.E.2d 251, 255 (N.C. Ct. App. 1974). Such consideration includes "the discharge of each part[y]'s obligations

---

[2] As a federal court sitting in diversity, we apply the substantive law of the forum state, including the state's choice-of-law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (per curiam). Here, that's North Carolina law, which provides that unless the parties agree otherwise, the law of the state with the "most significant relationship" to the contract applies. *See Boudreau v. Baughman*, 368 S.E.2d 849, 854–56 (N.C. 1988) (interpreting the North Carolina Commercial Code's choice-of-law provision, N.C. Gen. Stat. § 25-1-105(1) (1986) (current version at N.C. Gen. Stat. § 25-1-301(b))). 3TEK argued below that Texas law applies, but on appeal, it doesn't challenge the district court's determination that North Carolina law governs. Because "choice of law is waivable, not jurisdictional," *Weiner v. AXA Equitable Life Ins.*, 58 F.4th 774, 779 (4th Cir. 2023), we too apply North Carolina law.

10

under the contract." *Lambe-Young, Inc. v. Austin*, 331 S.E.2d 293, 296 (N.C. Ct. App. 1985).

Accordingly, mutual rescission occurs when one party abandons or repudiates the contract (or expresses its intent to do so), and the other party "declares the contract rescinded." *Top Line*, 455 S.E.2d at 466 (quoting *Brannock*, 155 S.E.2d at 542).

Wall and 3TEK mutually rescinded the February Agreement. Wall requested its "deposit back in full" because it "[couldn't] afford to wait any longer." J.A. 2159. 3TEK accepted Wall's "request to cancel the [February Agreement]" and agreed to refund its deposit. J.A. 2160.

The parties had a "meeting of the minds" that through this exchange, they rescinded the February Agreement. *Compare* J.A. 668 (Dan confirming that when he requested the refund, he intended to communicate, "I'm done. We're done."), *with* J.A. 2253–54 (Morrison explaining his understanding that Dan intended to cancel the February Agreement, and that 3TEK agreed to cancel it). They each agreed to release the other of its obligations under the February Agreement and return the other to its pre-February Agreement status.

Wall insists, though, that this exchange can't constitute mutual rescission because the parties didn't agree on a material term: the timing of the refund.[3] Not so.

---

[3] At oral argument, Wall contended that the timing of the refund was a material term. Because we find this argument unpersuasive, we don't address whether Wall sufficiently raised it in its briefing.

11

Wall is correct that for a contract to be valid, the parties must agree to "all material terms." *Boyce v. McMahan*, 208 S.E.2d 692, 695 (N.C. 1974). But the timing of performance isn't a material term absent an express provision saying so. *See, e.g.*, *Maxwell v. Michael P. Doyle, Inc.*, 595 S.E.2d 759, 764 (N.C. Ct. App. 2004) ("[W]here a contract does not specify the time of performance, the law will prescribe that performance must be within a reasonable time . . . ." (cleaned up)); N.C. Gen. Stat. § 25-2-201 North Carolina cmt. (explaining that quantity is the only material term in a contract for the sale of goods).

Wall didn't make its request to rescind contingent on 3TEK's refunding the deposit by a specific time. It only requested that 3TEK refund the deposit in full, which 3TEK agreed to do. So the parties' agreement to rescind the February Agreement is valid despite their not specifying the timing of the refund.

Since the refund wasn't a material term, then, as Wall concedes, the statutory gap-filling provision is at a "reasonable time." *See* N.C. Gen. Stat. § 25-2-309(1) ("The time for . . . any . . . action under a contract if not provided in this article or agreed upon shall be a reasonable time."); N.C. Gen. Stat. § 25-2-201 North Carolina cmt. (explaining that Section 25-2-309 provides the gap-filling provision when a contract doesn't specify the time of performance); *cf. J.B. Colt Co. v. Kimball*, 129 S.E. 406, 409 (N.C. 1925) ("The rule is that when the contract does not specify the time for delivery, a reasonable time will be implied as a matter of law."). As applied here, the parties' rescission agreement required that 3TEK return Wall's deposit at a reasonable time.

12

Yet even with this gap-filler, Wall contends that the rescission still isn't valid because 3TEK's "contingent and unclear promise" to refund the deposit upon finding a replacement buyer doesn't constitute a "reasonable time." Appellant's Br. at 45.

But what constitutes a reasonable time is a question of performance, not contract formation. *Cf. J.B. Colt*, 129 S.E. at 409. So whether 3TEK refunded the deposit within a reasonable time would only matter in the face of an allegation (not made here) that 3TEK breached the rescission agreement by failing to do so.

We also reject Wall's argument that no matter what the parties said or intended, 3TEK couldn't agree to rescind because it couldn't immediately return the full deposit. According to Wall, the "general rule" is that "a party is not allowed to rescind where he is not in a position to put the other in *statu quo* by restoring the consideration passed." *Opsahl v. Pinehurst Inc.*, 344 S.E.2d 68, 74 (N.C. Ct. App. 1986) (quoting *Bolich v. Prudential Ins. of Am.*, 173 S.E. 320, 327 (N.C. 1934)).

That rule, though, applies only when a party seeks rescission as an equitable remedy in court. *See, e.g.*, *Melton v. Fam. First Mortg. Corp.*, 576 S.E.2d 365, 370–71 (N.C. Ct. App. 2003) (citing *York v. Cole*, 118 S.E.2d 419, 420 (N.C. 1961) (per curiam)). When the parties agree to rescission, no such rule exists. Rather, the requirement is mutuality. *See, e.g.*, *Brannock*, 155 S.E.2d at 542 ("For rescission there must be mutuality, expressed or implied." (quoting *Dooley v. Stillson*, 128 A. 217, 218 (R.I. 1925))).

The words and intent of the parties satisfied that requirement here, and thus the district court correctly held that they mutually rescinded the February Agreement.

2.

13

That doesn't end our inquiry.  Wall insists that even if the parties mutually rescinded the February Agreement, they subsequently revived it.  But North Carolina law says otherwise.

"Recission is not merely a termination of contractual obligation.  It is abrogation or undoing of it from the beginning.  It seeks to create a situation the same as if no contract ever had existed." *Brannock*, 155 S.E.2d at 542 (quoting *Dooley*, 128 A. at 218).

So when 3TEK declared that the February Agreement was cancelled in response to Wall's request to cancel it, the Agreement was extinguished.  The parties' subsequent conduct couldn't revive it—there was nothing to revive.  *Cf. Altmayer-Pizzorno v. L-Soft Int'l, Inc.*, 302 F. App'x 148, 155–56 (4th Cir. 2008) (holding that even if the parties' conduct was inconsistent with termination, "such conduct cannot 'revive' a contract that has been terminated").

To proceed with the sale of a shredder post-rescission, the parties needed to execute a new contract, in writing.  *See* N.C. Gen. Stat. § 25-2-201(1) (requiring that a contract for the sale of goods be in writing when the price is $500 or more).  But they didn't, and in any event, Wall's complaint only alleges that 3TEK breached the February Agreement.

That Agreement, though, ceased to exist when the parties mutually rescinded it.  So to the extent that Wall's claims rely on 3TEK's conduct post-rescission, they still fail.

B.

Our assessment of Wall's claims is thus limited to the period before rescission.  In North Carolina, mutual rescission doesn't prohibit the recovery of damages for an antecedent breach.  *See* N.C. Gen. Stat. §§ 25-2-106(3)–(4), -720.  As relevant here, the

14

buyer can recover damages for the seller's failure to make delivery. *See id.* §§ 25-2-711 to -713, -715; *cf. Ralston Purina Co. v. McFarland*, 550 F.2d 967, 970–71 (4th Cir. 1977).

But, of course, to recover, Wall first must show that 3TEK breached a contract for the sale of a shredder. *Cf. Wells Fargo Ins. Servs. USA v. Link*, 827 S.E.2d 458, 472 (N.C. 2019) (establishing that to succeed on a breach of contract claim, the party must prove (1) the existence of a valid contract and (2) a breach of its terms). This, Wall cannot do.

According to Wall, the February Agreement was a contract for the sale of a shredder, subject to two conditions precedent: that Wall (1) pay the 20% deposit and (2) execute the sales contract. Wall contends that it satisfied the former, and that 3TEK implicitly waived the latter, thereby rendering the Agreement an enforceable sales contract that 3TEK breached by failing to deliver the shredder by the promised dates. We agree with the district court that Wall's waiver argument lacks support in fact and law.[4]

When a contract imposes a condition precedent, that condition must be performed for the parties to become bound by the agreement. *Harris & Harris Const. Co. v. Crain & Denbo, Inc.*, 123 S.E.2d 590, 595 (N.C. 1962). But like all provisions, a condition precedent may be waived. *See Whitehurst v. FCX Fruit & Veg. Serv., Inc.*, 32 S.E.2d 34, 39 (N.C. 1944); N.C. Gen. Stat. § 25-2-209(4); N.C. Gen. Stat. § 25-2-209 North Carolina cmt. (construing Section 25-2-209(4) as according with *Whitehurst*).

---

[4] Wall contends that the district court erred when it held that the February Agreement wasn't an agreement to sell a shredder, but one to secure a production slot. But we needn't decide this issue because the February Agreement required that Wall execute a sales contract, and that condition was neither fulfilled nor waived before the parties mutually rescinded. So either way, Wall's breach of contract claim fails.

15

Waiver of a condition precedent can be express or implied "by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived." *See Whitehurst*, 32 S.E.2d at 39. But at bottom, waiver must be intentional. *See Guerry v. Am. Tr. Co.*, 68 S.E.2d 272, 275 (N.C. 1951).

Although Wall concedes that 3TEK didn't expressly waive the condition precedent that Wall execute a sales contract, Wall insists that 3TEK's conduct impliedly did so. So we must determine whether the district court erred in holding that the undisputed facts foreclose such a determination. *Cf. Phx. Ltd. P'ship of Raleigh v. Simpson*, 688 S.E.2d 717, 722 (N.C. Ct. App. 2009) ("Although waiver is a mixed question of law and fact, when the facts are determined, it becomes a question of law." (cleaned up)). It did not.

Wall admits—for good reason—that through May 30, 2019, 3TEK "still wanted" the sales contract signed. Appellant's Br. at 33 n.6. Recall that in mid-April, Wall sought to exercise its right of first refusal for the second production slot. But rather than executing the sales contract, Wall returned redline edits with additional terms. 3TEK followed up twice about the edits, including at the end of May, but Wall neither executed nor communicated further about the sales contract.

Despite 3TEK's attempts to enforce this condition precedent, Wall claims that 3TEK never reminded Wall about the sales contract when the parties were in "regular contact" from June to October 2019, and therefore, 3TEK led Wall to believe that it didn't need to execute it. *Id.* at 34. This argument relies on too narrow an interpretation of North Carolina law.

16

A party's failure to remind the other about a condition precedent or insist on its completion can only amount to waiver if the party also acts in a way that's inconsistent with the condition's enforcement. *See, e.g.*, *Faw v. Whittington*, 72 N.C. 321, 324 (1875) ("The mere lapse of time or other delay in asserting [a party's claim to specific performance] unaccompanied by acts inconsistent with his rights, will not amount to a waiver or abandonment."); *Danville Lumber & Mfg. Co. v. Gallivan Bldg. Co.*, 97 S.E. 718, 720 (N.C. 1919) ("Mere silence at a time when there is no occasion to speak is not a waiver, nor evidence from which waiver may be inferred, especially where such silence is unaccompanied by any act or conduct calculated to mislead.").

The two cases from the Court of Appeals of North Carolina that Wall relies on exemplify this standard—and, as we'll explain, are distinguishable from this case.

In *Phoenix Limited*, the parties entered a lease agreement that included an option to buy and a condition that closing occur 180 days after the option was exercised. *See* 688 S.E.2d at 719–20. But after the option was exercised, the parties continued to perform their closing obligations and discuss the sale long past the closing date. *See id.* at 720.

When the lessor entered an agreement to sell the property to a third party, the lessee sued for specific performance. *Id.* at 721. The lessor argued he wasn't required to convey the property because the parties didn't close within 180 days and the contract included a "time is of the essence" provision. *Id.* at 722. But the court held that the lessor waived this provision because he not only "never insisted" on closing on the specified date, but also "made statements and took actions" that were *inconsistent* with enforcing that date. *See id.* at 723.

17

So too in *Burden Pallet Co. v. Ryder Truck Rental*, 271 S.E.2d 96 (N.C. Ct. App. 1980). There, the court held that the lessor waived a condition precedent that the parties' lease agreement for a tractor be executed at the lessor's general offices. *Id.* at 97–98. The court explained that the lessor not only "failed to notify" the lessee that the contract wasn't executed at the general offices, but also provided the tractor and accepted the lessee's payments for about a year. *Id.* at 98. Like *Phoenix Limited*, the lessor's performance under the contract was *inconsistent* with enforcing the condition precedent.

The difference here is that even accepting Wall's contention that 3TEK didn't remind Wall about the sales contract condition from June through October, Wall hasn't shown that 3TEK acted inconsistently with that condition. The February Agreement provided that if—and only if—Wall paid the 20% deposit and signed the sales contract, would 3TEK then pledge a firm shipment date. But Wall doesn't allege, and no evidence in the record shows, that 3TEK ever pledged this date before the parties mutually rescinded the Agreement.

Still, Wall argues that 3TEK acted inconsistently with the condition because even after Wall didn't sign the sales contract, 3TEK continued to communicate with Wall about the shredder and its production status. Wall is mistaken.

Unlike in *Phoenix Limited*, for example, there was no time limit attached to the sales contract condition, such that we could infer 3TEK's intent to waive the condition after it continued to communicate with Wall. *Cf. Fletcher v. Jones*, 333 S.E.2d 731, 735 (N.C. 1985) (holding that the seller waived a closing date provision because for five months after

18

that date passed, he continued to reassure the buyer of his willingness to perform and asserted his belief that the contract was "in full force and effect").

Instead, that 3TEK continued to communicate with Wall without pledging a shipment date demonstrates its intent to reinforce the February Agreement, as written. 3TEK wanted to sell a shredder to Wall, but only if Wall signed the sales contract. 3TEK's ongoing communications with Wall may have facilitated the former, but they didn't waive the latter. *Cf. Demeritt v. Springsteed*, 693 S.E.2d 719, 721–22 (N.C. Ct. App. 2010) (rejecting the seller's argument that the buyer waived conditions precedent because the evidence showed that the buyer "acted in accordance with the written agreement" and "did not act in a way that contradicted the written agreement").

Because the sales contract condition was neither waived by 3TEK nor fulfilled by Wall, Wall's breach of contract claims fail.

* * *

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

19