**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-6473

THOMAS SHANE MATHERLY,

Plaintiff − Appellant,

v.

J.F. ANDREWS; DEBORAH A. GONZALES; CANDICE GREGORY; CHARLES SAMUELS; KENNETH R. MCKOY; KAREN STEINOUR,

Defendants − Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:11−ct−03020−BR)

Argued: March 21, 2017                                    Decided: June 8, 2017

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Floyd joined.

**ARGUED**: Matthew Thomas Houston, Ashley Lee Hogewood, III, K&L GATES LLP, Raleigh, North Carolina, for Appellant. Christina Ann Kelley, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF**: John H. Culver, III, K&L GATES LLP, Charlotte, North Carolina, for Appellant. John Stuart Bruce, Acting United States Attorney, Matthew L. Fesak, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees.

DIAZ, Circuit Judge:

Pursuant to the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act"), 18 U.S.C. § 4248, the government certified Thomas Matherly as a sexually dangerous person in November 2006. At the time, Matherly was in the custody of the Federal Bureau of Prisons (the "BOP") at the Federal Correctional Institution in Butner, North Carolina ("FCI Butner"), serving a 41-month sentence for possession of child pornography. In May 2012, a court in the Eastern District of North Carolina civilly committed Matherly as a sexually dangerous person, and he remains at FCI Butner today.

While awaiting his civil commitment hearing, Matherly filed suit against BOP employees in their official capacities (the "BOP Defendants") challenging various conditions of his confinement at FCI Butner. The district court dismissed some of Matherly's claims and subsequently granted summary judgment as to the others, and Matherly appealed. Finding no constitutional or statutory violations flowing from the conditions of Matherly's confinement, we affirm.

I.

A.

We recite the relevant facts in the light most favorable to Matherly. The thrust of Matherly's pro se complaint is that his confinement at FCI Butner violates the Due Process Clause of the Fifth Amendment because certain conditions applicable to him are more restrictive than, identical to, or similar to conditions applicable to prisoners housed

at FCI Butner. He also alleges violations of his rights under the First Amendment and the Fair Labor Standards Act (the "FLSA").

With respect to his claims under the Fifth Amendment and as is relevant here, Matherly resides in the Maryland Unit at FCI Butner, which houses all—and only—civil detainees. As such, he is subject to BOP policies that are "punitive in effect." J.A. 31. Matherly must wear the same uniform as a prisoner, is limited to purchasing the same items from the commissary that a prisoner can purchase, and can watch only those television programs that a prisoner can watch. Furthermore, he is double-bunked with another civil detainee.

Matherly comes into contact with criminal detainees on a daily basis. He eats in FCI Butner's mess hall, where prisoners serve him his food and otherwise congregate. The Maryland Unit contains offices for BOP staff, which prisoners visit daily to see staff members. Prisoners also walk through the Maryland Unit three times a day to bring a food cart to the Special Housing Unit, even though there is a separate entrance to that unit. And when Matherly needs his hair cut, a prisoner cuts it.

Prisoners "often taunt and harass" Matherly and the other civil detainees, "calling them '[b]aby rapers' and 'child molest[e]rs.'" J.A. 29. Matherly contends that "[t]his threatening and harassing behavior . . . could very likely lead to a physical confrontation at some point." J.A. 29. That is especially true because "in a prison setting a sex offender is the most despised type of inmate." J.A. 32. However, "BOP Food Service staff often laugh when this harassment occurs." J.A. 29.

As to actions by the BOP, employees strip search civil detainees to punish them, often after one of them complains about living conditions or staff members. The searches are conducted to intimidate and humiliate. Matherly "has been subjected to these types of searches after arguing or disagreeing with correctional staff that he isn't an 'inmate.'" J.A. 34. The BOP also conducts random mass shakedowns, which involve a search of detainees' living quarters for contraband.

Matherly also alleges that he would like to take more educational and vocational training courses, but doesn't have the same opportunities as a prisoner. Furthermore, prisoners can participate in Narcotics Anonymous and Alcoholics Anonymous, but civil detainees cannot.

With respect to his First Amendment claim, Matherly says that all of his incoming and outgoing mail is inspected. He suggests as an alternative that he be allowed to open his mail in the presence of a BOP official. Finally, as for his FLSA claim, Matherly has a job at FCI Butner which pays 29 cents per hour, and he contends that he should be paid at the federal minimum wage.

B.

The district court partially granted the BOP Defendants' Rule 12(b)(6) motion to dismiss. As is relevant here, the court grouped together Matherly's claims about double-bunking, wearing a uniform, purchasing items from the commissary, and watching television (the "BOP Policies Claims") and dismissed them because Matherly had failed to show that those policies were punitive. The court also dismissed claims about encountering prisoners and being threatened by them (the "Commingling with Prisoners

4

Claims") because Matherly alleged only speculative harm, and dismissed the FLSA claim because that statute does not apply to Adam Walsh Act detainees. However, the court allowed Matherly's claims about strip searches and mass shakedowns (the "Strip Searches and Mass Shakedowns Claims"), incoming and outgoing mail (the "Mail Claims"), and educational and vocational programs (the "Educational and Vocational Programs Claims") to proceed.

Discovery ensued, and Matherly deposed several BOP employees. He also retained Deborah McCulloch as a pro bono expert in support of his claims. McCulloch is a licensed clinical social worker who has held various positions with the state of Wisconsin, including Superintendent of the Sand Ridge Secure Treatment Center, in which capacity she implemented Wisconsin's civil commitment program for sexually violent persons.

With respect to the Strip Searches and Mass Shakedowns Claims, BOP Lieutenant Hilda Candelario gave deposition testimony that she investigates fights and assaults at FCI Butner. According to Candelario, the Maryland Unit experiences fights, assaults, and attempts to harbor weapons and contraband, just as do the parts of FCI Butner where prisoners are housed. Prisoners and civil detainees are treated the same when it comes to strip searches and mass shakedowns. As to strip searches, "[t]here are certain policies in place." J.A. 268. In particular, a civil detainee is strip searched if he meets with a visitor, reenters the Maryland Unit after returning from outside of FCI Butner or from "an administrative or detention issue," or is suspected of possessing contraband. J.A. 269. As to mass shakedowns, every part of FCI Butner is searched "within a certain amount of

5

time," but there is no set schedule for doing so because the civil detainees and prisoners would become aware of it if one existed. J.A. 270. There are a number of reasons why the BOP might decide to conduct a mass shakedown. For example, a supervising officer can order one as a matter of discretion, and the BOP sometimes conducts one in response to finding large amounts of contraband during "regular searches." J.A. 271.

In her expert report, McCulloch acknowledged that "[s]earches of areas, rooms, and persons are important in secure facilities in order to control contraband and to enhance the safety of its residents, visitors, and staff," and that "[s]trip searches are common across other sex offender civil commitment programs in secure facilities." J.A. 296. She also noted that "[p]eriodic searches of an entire institution or areas of an institution are important in order to maintain security and enhance safety," and that "state civil commitment treatment programs" use similar techniques. J.A. 296. But she criticized the lack of written policies at FCI Butner, opining that written policies help ensure that strip searches are performed "in a manner that preserves a person's dignity and privacy as much as possible," and that "[i]t is nearly impossible to provide a consistent, non-arbitrary search of rooms and areas without a specific policy on allowable items." J.A. 296.

The district court granted summary judgment as to the Strip Searches and Mass Shakedowns Claims because no reasonable fact finder could conclude that the BOP's use of strip searches and mass shakedowns amounted to unconstitutional punishment.

With respect to the Mail Claims, Dr. Karen Steinour gave deposition testimony that she is the administrator of the BOP's Commitment and Treatment Program, in which

6

capacity she supervises treatment and clinical services for civil detainees and court-ordered forensic evaluations for § 4248 proceedings. According to Steinour, the BOP reviews all mail to and from the Maryland Unit, save for legal mail. As far as she is aware, there is no written policy regarding the review of detainee mail. By contrast, the BOP searches prisoners' mail on a random basis.

The BOP used to randomly screen Maryland Unit mail, but those random screenings revealed "that individuals were writing about hurting kids." J.A. 205. For example, the BOP intercepted letters where civil detainees wrote to other inmates in order to arrange for children to visit FCI Butner for the purpose of being molested. In addition to threatening the safety of individuals outside of FCI Butner, that sort of correspondence, which contains "harmful materials," has the potential to "negatively affect the treatment" of the civil detainees. J.A. 192. Those sorts of letters prompted the BOP to take "a more conservative approach." J.A. 205. Under the current policy, the mailroom screens all incoming publications and the Maryland Unit secretary, Norma Baskerville, reviews all correspondence.

Mailroom employees have had formal training on how to review publications. That training includes showing them examples of proscribed content. Employees have "parameters" to work within, such as looking for "things that depict . . . sexual deviance and glorify victimization of others." J.A. 194. Moreover, employees and supervisors discuss individual publications in order to decide whether the content is problematic.

Unlike the mailroom employees, Baskerville has not had formal training on how to review correspondence. However, Steinour has "had a lot of contact with [her]"

7

regarding "what to look for in letters." J.A. 197. For example, Baskerville looks for "certain pictures and icons that identify certain groups of individuals who are into man-boy love," as well as for "certain phrases, if used in certain contexts, [which] might be communicating something very different" from what they appear to be "on the surface." J.A. 197–98. And, as the mailroom employees do, Baskerville will often consult with a supervisor in order to decide whether content is problematic.

If either a mailroom employee or Baskerville finds a piece of mail to be problematic, the item is flagged for further review by Steinour. Ultimately, however, only the warden may withhold mail from being delivered. "[I]t's not real often that mail is not delivered." J.A. 199. However, flagged mail may be shared with the detainee's treatment providers or used for future commitment proceedings.

In her expert report, McCulloch opined that "[i]n the absence of a detailed written policy and guidelines regarding incoming and outgoing mail for the civilly committed population, there is a risk for staff to make arbitrary decisions about what is counter-therapeutic and what is not." J.A. 297. In her experience, "[i]t is relatively easy to identify security issues and general contraband, but it is much more difficult to define counter-therapeutic content." J.A. 298. She also noted that "[t]he civil commitment programs with which I am most familiar do, to varying degrees, review and monitor mail but do so with written policies." J.A. 297.

The district court granted summary judgment as to the Mail Claims, concluding that the BOP's mail policies were reasonably related to its legitimate interests of maintaining institutional safety, rehabilitating civil detainees, and protecting the public.

8

As to the Educational and Vocational Programs Claims, however, the court denied summary judgment, finding "a genuine dispute of material fact as to whether defendants' limitations on Matherly's access to educational and vocation[al] programs [were] reasonably related to treatment and security interests." J.A. 552. Steinour's declaration was the only evidence that the court balanced against the allegations in Matherly's complaint and McCulloch's expert report, which the court said "confirmed Matherly's assertion that" no vocational courses were available. J.A. 551. With some exceptions, Steinour spoke about the educational and vocational opportunities at FCI Butner in general terms. For example, as the court noted, Steinour "stated that there 'may be' additional educational programs available to civil detainees within the Maryland Unit," but did not go into particulars. J.A. 551. That ambiguity led the court to conclude that "[a] reasonable finder of fact could infer that" the BOP's decisions "constitute[d] punishment." J.A. 552.

The court subsequently granted the BOP Defendants leave to file another motion for summary judgment, and the BOP Defendants then submitted additional evidence regarding the Educational and Vocational Programs Claims.

Andres Hernandez stated in a declaration that he is the clinical coordinator of the Commitment and Treatment Program (the "CTP"). According to Hernandez, "[t]he mission of the CTP is to protect the public by reducing the incidence of sexual violence and child molestation in society." J.A. 649–50. "The CTP fulfills this mission by confining and providing comprehensive treatment services to individuals who . . . have been certified" under the Adam Walsh Act. J.A. 650. The CTP provides, among other

9

things, "sex offender specific group and individual therapy, along with non-sex offender specific groups and activities (such as interpersonal skills, financial management, and art), designed to address a participant's overall well-being." J.A. 651.

The estimated amount of time a civil detainee (prisoners cannot participate) is expected to spend in individual, group, and other CTP treatment in order to obtain the intended therapeutic benefit is approximately 30 hours per week. "[E]ducational and vocational training opportunities outside the CTP curriculum are considered collateral and subordinate to a CTP participant's treatment regimen . . . ." J.A. 652–53. Matherly "has consistently refused [to] participat[e] in the treatment program." J.A. 654.

Bryan Neagle stated in a declaration that he is the supervisor of education at FCI Butner. The Butner Education Department is responsible for planning and administering educational and vocational programming throughout FCI Butner. Neagle explained that prisoners and civil detainees "are kept separate from one another, to the extent possible," and thus "educational and vocational programming offered to the two populations varies." J.A. 584. Charles Ratledge, the Warden at FCI Butner, made the same point in his declaration, and also noted that "limited incidental contact may occur." J.A. 639. As of August 2015, there were approximately 60 civil detainees and 665 prisoners at FCI Butner.

The Education Department's main library and its electronic law library computers are available for prisoners to use six days per week for a total 49 hours each week. Civil detainees, by contrast, have access to those resources for two hours a week on Wednesdays, which happens to be the only weekday that no group therapy activities are

10

scheduled in the CTP. The Maryland Unit has its own satellite library for use solely by civil detainees. Civil detainees may access the satellite library on a daily basis for a total of 87.5 hours per week. The main library has seven electronic law library computers, and the satellite library has four.

The main library also has a classroom with 20 computer terminals running OASIS, which is a computer program that offers approximately 200 courses, including 27 academic skills courses, 82 vocational skills courses, and 14 interpersonal skills courses. There are no OASIS-equipped computers in the Maryland Unit, but the Education Department is "exploring the possibility of locating OASIS computers in the Maryland Unit" in conjunction with a review of "whether [that] can be accomplished without compromising the safety and security of the institution." J.A. 588–89. BOP staff had previously discovered that civil detainees had used the word processor in the OASIS program to write "pretty unspeakable stories about abuse of children." J.A. 251.

The Education Department also offers Adult Continuing Education courses, which are "proposed, planned, and taught, once approved, by inmates." J.A. 586. Prisoners and civil detainees do not participate in these classes together, and thus the courses offered to each population vary. Matherly has completed 10 of these courses.

Moreover, the Education Department offers BOP-staff-led GED courses to prisoners but not to civil detainees because there isn't an expressed need for such a course. If a civil detainee expresses interest in obtaining his GED, "the Education Department will make all efforts to provide the necessary instruction." J.A. 589.

11

Previously, a civil detainee did express such interest, and the BOP put in place a self-study plan and provided tutors. Matherly has a high school diploma or its equivalent.

FCI Butner also contracts with a local community college to offer vocational courses which "are taught in [dedicated] classrooms located [in a section of FCI Butner outside of the Maryland Unit], and typically cost the BOP approximately $3,000 to $5,000 per course, per session." J.A. 591. These courses "are typically taught four days per week, for approximately one to two hours per day, for a total of approximately 115–120 hours of instruction." J.A. 591. Given the amount of classroom time required for each course, only prisoners can participate in them. The BOP previously offered one such course (a horticulture course) to civil detainees, approximately 8–12 of whom enrolled, but the BOP terminated it in 2014 based in large part upon the class's interference with the CTP. The BOP "has considered the feasibility of providing [community college] courses" in the Maryland Unit, but given the "limited number of anticipated participants" and the high cost, the BOP concluded it was "cost prohibitive to provide [them] only to" civil detainees. J.A. 592–93.

The BOP Defendants do not contest Matherly's claim that Narcotics Anonymous meetings are limited to prisoners. Civil detainees may, however, participate in Alcoholics Anonymous, and as of August 2015 approximately five to seven were doing so. Meetings for prisoners and civil detainees are held separately.

After considering the additional evidence submitted by the BOP Defendants, the district court granted summary judgment as to these claims, concluding that no reasonable finder of fact could characterize the educational and vocational opportunities

12

available to Matherly as punitive in nature or otherwise inconsistent with the requirements of the Constitution.

This appeal followed.

## II.

We begin by considering in turn Matherly's arguments as to the dismissal of his BOP Policies Claims, his Commingling with Prisoners Claims, and his claim under the FLSA. We review the district court's grant of a motion to dismiss de novo. *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). As for pro se complaints, we "liberally construe" them. *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 72 (4th Cir. 2016).

## A.

Matherly says that because he, "as a patient involuntarily committed to a prison, pleaded facts establishing that he is subject to conditions 'identical to, similar to, or more restrictive than' those of criminal inmates, he is entitled to a presumption that his confinement is punitive" in violation of the Due Process Clause of the Fifth Amendment. Appellant's Br. at 17 (quoting *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004)). The

13

BOP Defendants, on the other hand, contend that *Jones* is out of step with settled precedent governing the treatment of civil detainees and that we should apply a standard more deferential to the professional judgment of BOP administrators. Thus, we consider the appropriate standard to apply before resolving Matherly's appeal as to the BOP Policies Claims.

1.

"Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982) (examining conduct toward a mentally disabled person involuntarily committed to a state institution). Because § 4248 provides for civil commitment, the Fifth Amendment forbids subjecting an individual detained under the Adam Walsh Act to conditions of confinement which are punitive in nature. *Cf. Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) ("[T]he pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'"). Though civil commitment under the Adam Walsh Act is a different experience than other forms of civil detention, such as pretrial detention, the same overarching principle applies—the Fifth Amendment forbids punishing a detained person absent an adjudication of guilt. Accordingly, we think it natural to borrow from the pretrial-detainee context the standard for constitutionally impermissible "punishment"

14

and apply it here. To do otherwise would result in the unwieldy outcome of multiple definitions of unconstitutional "punishment" contingent upon the type of civil detention.

"To establish that a particular condition or restriction of . . . confinement is constitutionally impermissible 'punishment,' the [Adam Walsh Act] detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Martin*, 849 F.2d at 870 (citing *Bell*, 441 U.S. at 538–40). In applying this standard, we give deference to the officials who administer the civil commitment program. *See Youngberg*, 457 U.S. at 321.

"[T]he proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints" is struck by having "courts make certain that professional judgment in fact was exercised." *Id.* To that end, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* (internal quotation marks omitted); *cf. Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) ("States enjoy wide latitude in developing treatment regimens."). Ultimately, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)) (rejecting a constitutional challenge to implementation of Illinois law which authorizes civil confinement of persons charged with sex offenses).

15

Building upon *Youngberg*'s requirement that civilly committed persons be treated more considerately than prisoners, the Ninth Circuit has held that a presumption of punitive conditions applies when an individual detained awaiting civil commitment proceedings "is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." *Jones*, 393 F.3d at 932. Matherly asks us to follow the Ninth Circuit's lead in *Jones*. This we will not do.

To begin with, *Jones* concerns different subject matter (a person awaiting adjudication for civil commitment) than this case (a civilly committed person), and indeed *Jones* draws a distinction between the two statuses by recognizing that "a presumption of punitive conditions arises . . . where the individual is detained under conditions more restrictive than those he or she would face upon commitment." *Id.* at 934. *Jones*'s focus on that distinction makes any analogies to that case inexact.

There's also a bigger problem with *Jones*. Read literally and applied to post-adjudication civil detainees, as Matherly asks, the case places too great of a burden on prison administrators to justify their every move. *Youngberg* says that administrators have wide latitude to set conditions of treatment for civil detainees within institutions, 457 U.S. at 321, and *Seling* calls for a reasonable relation between the purpose of confinement and the challenged condition, 531 U.S. at 265. In other words, the Supreme Court has made clear that the judiciary should not be in the business of administering institutions. But *Jones* does just that, forcing a prison administrator into court to rebut a presumption of punitive conditions for civil detainees so long as those conditions are similar to what prisoners face, even if the administrator exercised her professional

16

judgment in establishing the conditions and a reasonable relation exists between the conditions and the purpose of confinement.

That framework expands the judiciary's involvement with decisions better left to the experts and places too much emphasis on superficial comparisons between conditions of confinement for civil detainees and prisoners. For example, Adam Walsh Act detainees might have less access to media containing images of children than prisoners do, but that comparison alone should not trigger a presumption of punitive conditions. Accordingly, we will follow circuit precedent from *Martin* and place the burden to show the lack of a reasonable relationship between a condition of confinement and a legitimate nonpunitive governmental objective upon the individual challenging the condition.

2.

Returning to the allegations in the BOP Policies Claims, Matherly says that he's being punished because the BOP double-bunks him with another civil detainee, forces him to wear the same uniform as a prisoner, and limits his purchases at the commissary and his options on television to those of a prisoner.

"[T]he confinement of mentally unstable individuals who present a danger to the public [is a] classic example of nonpunitive detention." *Hendricks*, 521 U.S. at 363 (internal quotation marks omitted); *see also Healey v. Spencer*, 765 F.3d 65, 78 (1st Cir. 2014) (rejecting constitutional challenge to conditions of confinement for civilly committed sexually dangerous persons in Massachusetts, and noting that "[d]isagreeable conditions can . . . be consistent with the demands of due process, so long as they do not amount to punishment"); *Allison*, 332 F.3d at 1079 (noting that "placement [of a civil

17

detainee] in a prison, subject to the institution's usual rules of conduct, [does not] signify punishment"). Furthermore, "a particular restriction or condition, which may on its face appear to be punishment, [can] instead [be] but an incident of a legitimate nonpunitive governmental objective." *Bell*, 441 U.S. at 539 n.20.

Matherly hasn't shown that the BOP imposed these conditions with an expressed intent to punish. Rather, he takes issue with them because prisoners are subject to the same conditions. But, as we explained above, that isn't enough to make out a constitutional violation. All of these conditions are incident to the legitimate nonpunitive governmental objective to confine individuals like Matherly who are sexually dangerous. *See* 18 U.S.C. § 4248(d)(2) (authorizing confinement of a sexually dangerous person until "the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment"); *cf. Bell*, 441 U.S. at 542 ("[T]here is [not] some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment.").

Thus, the district court correctly dismissed the BOP Policies Claims.

B.

Turning to the Commingling with Prisoners Claims, Matherly says that he "is constitutionally entitled to reasonable safety and freedom from any unsafe conditions," and "[b]y subjecting [him] to the particularly pleaded threats and taunts . . . and encouraging such behavior," the BOP has violated his rights. Appellant's Br. at 24.

18

Matherly's claims here fall into two camps. First, there are the claims that he's frequently in the presence of prisoners, such as when he eats his meals, when prisoners visit the Maryland Unit to see BOP staff members, when prisoners transport food through the Maryland Unit, and when Matherly gets his hair cut. Once again, however, Matherly has not shown that the BOP arranges these interactions with prisoners to punish—a conclusory allegation saying as much doesn't suffice. *See SD3*, 801 F.3d at 422 (providing that legal conclusions pleaded as factual allegations, "unwarranted inferences," "unreasonable conclusions," and "naked assertions devoid of further factual enhancement" are not entitled to the presumption of truth). Instead, his time spent around prisoners is merely incident to the government's legitimate nonpunitive objective to confine him.

Second, there are the claims that prisoners "often taunt and harass [Matherly and other civil detainees], calling them '[b]aby rapers' and 'child molest[e]rs,'" and that "BOP Food Service staff often laugh when this harassment occurs." J.A. 29. Matherly alleges that this situation "could very likely lead to a physical confrontation at some point." J.A. 29. Matherly, of course, has a Fifth Amendment interest in his own safety and personal security. *Youngberg*, 457 U.S. at 319–20. But even accepting that the taunts are objectionable, they don't offend the Fifth Amendment. To so hold would be to open the substantive-due-process floodgates.

That leaves Matherly with his claim that his contact with prisoners "could very likely" cause him harm at some point in the future. Such a claim, however, fails for lack of standing. To establish standing, Matherly "must show (1) an injury in fact, (2) a

sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted). "To establish injury in fact, [Matherly] must show that he . . . suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted). The "threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks omitted). Even liberally construed, the allegation about harm that might befall Matherly at some point in the future is too speculative to support standing for a claim under the Fifth Amendment. Simply put, Matherly pleads no facts establishing that the harm is certainly impending.

Accordingly, the district court correctly dismissed the Commingling with Prisoners Claims.

## C.

Next, we turn to Matherly's claim under the FLSA that he is entitled to the federal minimum wage as an employee of the BOP. This claim runs head first into our FLSA jurisprudence.

The FLSA provides that generally an "employer" shall pay an "employee" no less than the federal minimum wage, *see* 29 U.S.C. § 206, and defines an "employee" to mean "any individual employed by an employer," including "any individual employed by the Government of the United States," *id.* § 203(e)(1)–(2). In *Harker v. State Use Industries*, we held that the FLSA does not apply to "inmates participating in prison work programs." 990 F.2d 131, 132 (4th Cir. 1993). We based that decision on three considerations: (1) the inmates work "not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training"; (2) there is no "bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship"; and (3) the FLSA's purpose to allow for workers to maintain a "standard of living necessary for health, efficiency, and general well-being" counseled against applying the FLSA to inmates because "[w]hile incarcerated" they "have no such needs" since the prison "provides them with the food, shelter, and clothing that employees would have to purchase in a true employment situation." *Id.* at 133 (internal quotation marks omitted).

The *Harker* factors are applicable here and compel the conclusion that Matherly doesn't qualify as an "employee" within the meaning of the FLSA: (1) there is no indication that Matherly is working to turn a profit for the BOP; (2) his employment relationship with the BOP isn't the product of a bargained-for exchange; and (3) the BOP provides him with all of his necessities, satisfying the underlying purpose of the FLSA's minimum wage provision. *Accord Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (holding that the FLSA does not apply to a civil detainee committed as a sexually violent

21

person under Wisconsin law); *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (holding that the FLSA does not apply to a civil detainee committed as a sexually dangerous person under Massachusetts law).[*]

Therefore, the district court correctly dismissed Matherly's FLSA claim.

III.

We now turn to the district court's summary judgment decisions and address Matherly's arguments regarding the Strip Searches and Mass Shakedowns Claims, the Mail Claims, and the Educational and Vocational Programs Claims seriatim. We review a "district court's summary judgment ruling de novo, viewing the facts in the light most favorable to . . . the non-moving party and drawing all reasonable inferences in [its] favor." *Doe v. Kidd*, 501 F.3d 348, 353 (4th Cir. 2007). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A dispute is genuine if a reasonable jury could

---

[*] Because binding circuit precedent controls this issue, we decline Matherly's invitation to follow *Gonzales v. Mayberg*, where the district court for the Central District of California opined that the FLSA applied to individuals civilly committed as sexually violent pursuant to California law—it ultimately concluded that sovereign immunity protected California from suit under the FLSA. No. CV-07-6248, 2009 WL 2382686, at *4–5 (C.D. Cal. July 31, 2009). Nevertheless, even if *Harker* did not control, *Gonzales* would not be persuasive here because it's distinguishable. The plaintiff there alleged that he used his income to pay for a necessity of life (medical care), which raised an inference that the purpose of the FLSA was left unfulfilled, and the California statute at issue provided that "'[a]ny person admitted to a state hospital as a mentally disordered sex offender shall have the full patient rights [as other individuals who are involuntarily detained for evaluation or treatment].'" *Id.* at *4 (alterations in original) (quoting Cal. Welf. & Inst. Code § 6300.2).

return a verdict for the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (citations and internal quotation marks omitted).

## A.

Matherly, once again proceeding under the Fifth Amendment, says that there's a "genuine dispute . . . as to whether the [strip] searches and [mass] shakedowns are intended as a punitive measure." Appellant's Br. at 40. He takes issue with the lack of written policies, the categorical rules for strip searches, and the BOP's discretion to conduct mass shakedowns.

"There is no doubt that [the] BOP has a legitimate interest in maintaining the security of its facilities . . . ." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 215 (4th Cir. 2017) (analyzing BOP's conduct with respect to an Adam Walsh Act detainee confined at FCI Butner). Moreover, "deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." *Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 566 U.S. 318, 327–28 (2012).

There's no genuine dispute of material fact that the strip searches and mass shakedowns are reasonably related to the legitimate nonpunitive governmental objective to keep FCI Butner safe. The record shows that the Maryland Unit experiences the same sorts of security issues as does the rest of FCI Butner. Accordingly, BOP officials made the reasonable decision to treat prisoners and civil detainees the same when it comes to strip searches and mass shakedowns.

In particular, BOP officials exercised their professional judgment to institute an unwritten policy which calls for strip searching a civil detainee if he meets with a visitor,

reenters the Maryland Unit, or is suspected of possessing contraband. BOP officials also exercise their professional judgment in conducting mass shakedowns, basing their decisions on considerations such as the importance of keeping their searches unpredictable and the amount of contraband that they find during routine inspections. We owe deference to the BOP in this respect, and given the reasonable relationship between these practices and institutional security, it's not for us to opine on any tweaks that should be made. *See Youngberg*, 457 U.S. at 321.

And that's why McCulloch, who in her report criticizes the absence of written policies at FCI Butner on account of what she believes is an increased risk of intrusive and arbitrary conduct, fails to create a genuine dispute as to any material fact. Even assuming arguendo that a written policy is preferable, that would at most amount to a tweak in FCI Butner's security protocol rather than an indication that the strip searches and mass shakedowns are not reasonably related to a legitimate nonpunitive governmental objective. In fact, McCulloch effectively admits just that, recognizing the importance of strip searches and mass shakedowns in a secured facility. Ultimately, then, her opinion here is useful only to the extent that we can weigh it against the professional judgment of BOP officials. That, however, isn't our Fifth Amendment inquiry.

Nevertheless, summary judgment would be inappropriate if there existed a genuine dispute as to whether the BOP conducts strip searches or mass shakedowns with an expressed intent to punish. To that end, Matherly says in his verified complaint that the BOP has strip searched him in response to his arguing that he isn't an "inmate" and

that the BOP has strip searched other civil detainees in response to their complaining about living conditions and staff members.

"A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). "Conclusory or speculative allegations do not suffice" to oppose a properly supported motion for summary judgment, "nor does a mere scintilla of evidence." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks omitted); *accord Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory . . . ."). Matherly has offered nothing else—no dates (or months, or years), names of BOP employees who strip searched him, or other facts attendant to the strip searches. No reasonable jury could find for Matherly because such a finding "would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005).

For example, how much time elapsed between Matherly's complaints and the strip searches? Were there any other bases for the strip searches, such that pursuant to the BOP's unwritten policy Matherly would have been strip searched regardless of what he said to the BOP employees? Did the BOP employees give any reasons for conducting the strip searches? Did Matherly have personal knowledge of the strip searches of the other civil detainees? In large part because Matherly failed to put any particular strip search at issue, it's pure conjecture whether the BOP conducted them with an expressed intent to punish. *Cf. Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (explaining that speculation concerning retaliatory motives cannot create a genuine issue of material fact);

25

*Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (affirming grant of summary judgment on retaliatory discharge claim because lengthy interval between protected activity and adverse action negated inference of causal connection, and noting that even if causation were established, plaintiff "introduced no competent evidence" suggesting defendant's "legitimate non-discriminatory reason for its decision" was pretextual).

Thus, the district court correctly granted summary judgment as to the Strip Searches and Mass Shakedowns Claims.

B.

As to his Mail Claims under the First Amendment, Matherly contends that because the BOP reviews all incoming and outgoing mail save for legal mail, its "procedures cannot properly be construed as 'reasonably related' to a legitimate interest" and thus are unconstitutional. Appellant's Br. at 44.

A civil detainee has a First Amendment interest in sending and receiving mail. *See, e.g.*, *Heyer*, 849 F.3d at 218 (stating that an Adam Walsh Act detainee has a First Amendment interest in "communicat[ing] beyond [FCI] Butner's walls"). The BOP's mail policy restricts Matherly's First Amendment right, but that doesn't mean it's unconstitutional. Though we haven't had occasion to consider the constitutionality of restricting a civil detainee's access to mail, the Supreme Court has had ample opportunity to do so with respect to prisoners. Those principles, slightly modified, are fully applicable here.

In *Procunier v. Martinez*, the Supreme Court held that "censorship of prisoner mail is justified" if it "further[s] an important or substantial governmental interest

unrelated to the suppression of expression" and "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest." 416 U.S. 396, 414 (1974). However, cases that followed *Martinez* "erode[d] the high standard it set," *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1364–65 (11th Cir. 2011) (charting the progression towards a more deferential approach), leading to *Turner v. Safley*'s declaration that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," 482 U.S. 78, 89 (1987).

The *Turner* court gave four factors to assist with that reasonableness determination: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there's an "absence of ready alternatives" to the regulation, which "is evidence of [its] reasonableness." *Turner*, 482 U.S. at 89–90 (internal quotation marks omitted). Finally, in *Thornburgh v. Abbott*, the Court limited *Martinez* to regulations on outgoing correspondence and said that regulations on incoming mail should be analyzed under the more deferential *Turner* standard. 490 U.S. 401, 413–14 (1989) ("The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.").

27

We applied this authority in *Altizer v. Deeds* to draw a distinction between regulations for "opening and inspecting" a prisoner's incoming and outgoing non-legal mail and regulations for censoring a prisoner's outgoing non-legal mail. 191 F.3d 540, 547 (4th Cir. 1999). We held that *Turner* governs the former and *Martinez* the latter, the necessary implication being that *Turner* also governs regulations censoring a prisoner's incoming non-legal mail. *See id.* at 548. In particular, we recognized that "*Martinez* specifically held that the censorship of certain materials was essential to the protection of substantial governmental interests," and we found "[i]mplicit in" that holding "that inmates' outgoing mail may be opened and inspected by prison officials" because "[o]therwise, a prison official would never know that a letter contained the very type of material that . . . could rightfully be censored." *Id.* Thus, another necessary implication of *Altizer* is that prison officials may open and inspect a prisoner's incoming mail in order to censor it.

In *Heyer*, we applied *Turner* to a First Amendment claim that the BOP violated the rights of a deaf Adam Walsh Act detainee by not providing him with a videophone. 849 F.3d at 212–13. We explained that "[s]ome courts have made modifications to the *Turner* factors to reflect the differences between convicted prisoners and detainees." *Id.* at 214 n.9 (citing *Brown v. Phillips*, 801 F.3d 849, 853 (7th Cir. 2015) (concluding that in case involving civil detainee, *Turner* requires that challenged policy "must be rationally connected to the state's interests—here, security and the rehabilitation and treatment of sexually violent persons")). But because the plaintiff in *Heyer* did not ask for such a modified standard to be applied and in any event "we conclude[d] that his claims [were]

28

viable under the *Turner* factors as originally formulated," we declined to "decide whether adjustments should generally be made in cases involving civil detainees." *Id.*

*Turner* applies here with respect to Matherly's challenge to the BOP's opening and inspecting his incoming and outgoing non-legal mail. Though Matherly intimates that the BOP is censoring his mail, he fails to provide an example of a piece of his mail being censored or withheld and makes no legal argument regarding censorship. Accordingly, we proceed under *Turner* to consider the constitutionality of the BOP's policy for opening and inspecting mail, and thus answer the question we avoided in *Heyer*.

We conclude that *Youngberg* and its progeny require that we modify *Turner* for application to civil detainees. The adjustment is not difficult, however, and merely reflects the different interests that the government has in civil as opposed to criminal detention. Thus, a prison regulation impinging on a civil detainee's constitutional rights is valid if reasonably related to legitimate nonpunitive governmental interests. The four factors which inform that reasonableness determination stay the same, save for the substitution of "civil detainees" for "prison inmates" in the second factor and "inmates" in the third factor.

As for the first *Turner* factor, there is no genuine dispute that there is a valid, rational connection between the BOP's mail policy and the legitimate nonpunitive governmental interests to protect the public and to rehabilitate Adam Walsh Act detainees. *See* 18 U.S.C. § 4248(d)(2) (providing that the BOP has an interest in treating a civil detainee until he is no longer sexually dangerous to others); *Heyer*, 849 F.3d at

29

215 ("BOP has a legitimate interest in . . . protecting the public from further criminal acts by inmates and [civil] detainees."). BOP administrators responded to randomly intercepted mail that threatened the safety of individuals outside of FCI Butner and stymied the rehabilitation of the civil detainees by exercising their professional judgment to review all incoming and outgoing mail. The purpose of the BOP's mail policy is to mitigate those threats. We owe deference to that policy and the ways in which the BOP has implemented it. *See Youngberg*, 457 U.S. at 321.

Though Matherly argues otherwise, neither the absence of a written policy nor the lack of formal training for Baskerville severs the valid, rational connection between the BOP's mail policy and the legitimate interests that it serves. There is a multi-level review process for mail that is flagged as problematic. And though Baskerville hasn't had formal training on how to screen correspondence, she has had "a lot of" informal training on "what to look for in letters." J.A. 197. Among other things, she looks for symbols and phrases that the untrained eye might not recognize as holding a sexual meaning. Furthermore, the mailroom employees who handle publications have had formal training on the "parameters" that they should work within, such as looking for "things that depict . . . sexual deviance and glorify victimization of others." J.A. 194.

Taken as a whole, there's nothing arbitrary about the system that Matherly has described. Instead, it reflects the BOP's reasoned decisionmaking on how to rationally handle incoming and outgoing mail at FCI Butner. In her report, McCulloch suggests ways that the system could be improved, and perhaps she's correct. But that's different

from calling into question the connection between the BOP's mail policy and the interests of protecting the public and rehabilitating detainees, which she fails to do.

As for the remaining *Turner* factors, Matherly makes no argument, substantive or otherwise, except to suggest that he be allowed to open his mail in the presence of a BOP official. If Matherly could "point to an alternative that fully accommodates [his] rights at *de minimis* cost to" legitimate nonpunitive governmental interests, we could "consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Heyer*, 849 F.3d at 217 (quoting *Turner*, 482 U.S. at 90–91). There is no evidence on whether Matherly's proposal comes at *de minimis* cost, but common sense says that making a BOP official available to supervise each civil detainee while he opens his mail would be burdensome. Thus, Matherly's proposed alternative does not help his claim.

We are satisfied that the BOP can, consistent with the First Amendment, censor outgoing non-legal mail for material that either threatens the public or stymies the treatment of Adam Walsh Act detainees. *Cf. Altizer*, 191 F.3d at 549 (recognizing "a substantial governmental interest in censoring . . . from an inmate's outgoing mail . . . materials detrimental to the security, good order, and discipline of the institution, or dangerous to the public"). Given that Matherly has failed to provide any examples of censorship conducted by the BOP for an impermissible purpose, it follows that Matherly's "First Amendment rights are not violated when his outgoing mail is simply opened and inspected for" the purpose of effecting permissible censorship. *Id.* And as Matherly fails to establish a difference between the BOP's procedures for opening and

31

inspecting outgoing and incoming mail, the latter are necessarily constitutional on this record. *See Thornburgh*, 490 U.S. at 413.

Thus, the district court correctly granted summary judgment as to the Mail Claims.

C.

Finally, we consider the district court's grant of summary judgment as to the Educational and Vocational Programs Claims. Matherly argues that "[b]ecause the purpose of the [Adam Walsh] Act is to enable the rehabilitation of committed patients, depriving such individuals of the opportunity to receive educational and technical training on terms at least as frequent and favorable as those offered to criminal inmates is inherently punitive." Appellant's Br. at 28. Though this issue engendered the most litigation in this case, the principles discussed above make its resolution straightforward.

First, and to repeat, it's not the law in this circuit that a Fifth Amendment violation necessarily exists if a civil detainee is subject to a condition similar to or less favorable than the analogous one applicable to prisoners. *See supra* Part II.A.1. To the extent that Matherly's argument hinges on that idea—much of it does—it fails. Instead, in testing a condition's constitutionality we apply the *Martin* standard while giving deference if warranted under *Youngberg*.

Turning to *Martin*, because nothing in this record suggests that the BOP imposed any conditions related to educational or vocational programs "with an expressed intent to punish," Matherly must show that some condition is "not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." 849 F.2d at 870. The BOP's legitimate nonpunitive governmental objectives

32

include rehabilitating Adam Walsh Act detainees, *see* 18 U.S.C. § 4248(d)(2), maintaining institutional security and protecting individuals outside of FCI Butner, *Heyer*, 849 F.3d at 215, and allocating scarce resources in an effective fashion, *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006). There's no genuine dispute that all of the challenged conditions are reasonably related to those objectives.

The record shows that Adam Walsh Act detainees have exclusive access to the Commitment and Treatment Program, which is designed to treat their sexual dangerousness—the very reason that they are civilly committed. The CTP comprises individual and group therapy, as well as other activities geared towards fostering interpersonal, financial management, and art skills. The BOP estimates that an Adam Walsh Act detainee should spend about 30 hours per week on CTP activities, and it considers other educational and vocational training opportunities to be collateral and subordinate to the CTP. The BOP's emphasis on the CTP is entitled to deference and is obviously related to the objective of rehabilitation.

Beyond the CTP, the BOP offers various educational and vocational opportunities to prisoners and civil detainees, but also attempts to keep the two populations separate for safety reasons, though it acknowledges that incidental contact occurs. With respect to the libraries, civil detainees have access to their own satellite library for 87.5 hours per week, while prisoners have access to the main library for 49 hours per week. The main library contains computers equipped to run the OASIS program, which offers various educational and vocational courses. Civil detainees may use those OASIS computer terminals, as well as the rest of the main library, for two hours per week on Wednesday.

33

The satellite library, however, does not contain OASIS-equipped computers. The BOP says that Adam Walsh Act detainees abused the OASIS program in the past by using the word processor to write "unspeakable stories about abuse of children." J.A. 251. Accordingly, the BOP limited their access to it. These library policies reflect the BOP's exercise of its reasoned decisionmaking to strike a balance between institutional security, the protection of the public, and the provision of educational and vocational opportunities.

As for vocational classes, the BOP previously offered a horticulture class to civil detainees, but terminated it in 2014 based in large part upon its interference with the CTP. The typical monthly time commitment for a vocational class is 115 to 120 hours. The BOP says that it's impractical to offer these classes to civil detainees, not only because of the time commitment but also because the limited number of anticipated participants makes it cost prohibitive. Because it's clear to us that this decision is directly related to the objective of emphasizing rehabilitation, we need not consider the weight of the BOP's argument regarding the effective allocation of scarce resources.

The BOP also offers other opportunities, such as detainee- or prisoner-led Adult Continuing Education courses—Matherly has completed 10. In furtherance of limiting contact between civil detainees and prisoners, the two groups have their own courses, the content of which is dependent upon the instructor. There's no GED program for civil detainees, but Matherly has his high school diploma or its equivalent and hasn't shown that any civil detainee wants to pursue a GED at the moment. Moreover, in the past the BOP has provided civil detainees with resources to take the GED. The BOP Defendants

34

don't contest that civil detainees lack access to Narcotics Anonymous meetings, but again Matherly hasn't shown that he or any other civil detainee wants to participate. And, contrary to Matherly's allegation, civil detainees have their own Alcoholics Anonymous group. These conditions are all related to the BOP's interests in maintaining institutional safety and not using scarce resources on programs for which there is no demand.

Finally, McCulloch's report fails to create a genuine dispute of material fact. She was not provided with a list of educational or vocational courses available to civil detainees, and thus it was "difficult" for her to compare FCI Butner's offerings to those at other civil commitment programs. J.A. 295. As such, her opinions on this topic are necessarily abstract. She did, however, visit FCI Butner's libraries and found them to be "adequate in comparison to other civil commitment programs." J.A. 295.

In sum, the district court correctly granted summary judgment as to the Educational and Vocational Programs Claims.

IV.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*

35