**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 21-1575**

─────────

RASHAD MATTHEW RIDDICK,

Plaintiff – Appellant,

v.

JACK BARBER, Former Interim Commissioner of Virginia Department of Behavioral Health and Developmental Services; REBECCA A. VAUTER, CSH Director,

Defendants – Appellees,

and

HUGHES MELTON, Commissioner of Virginia Department of Behavioral Health and Developmental Services,

Defendant.

------------------------------

UNITED STATES OF AMERICA,

Amicus Supporting Appellant.

─────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  David J. Novak, District Judge.  (3:19-cv-00071-DJN)

─────────

Argued:  May 10, 2024                                    Decided:  July 26, 2024

─────────

Before GREGORY and HARRIS, Circuit Judges, and David A. FABER, Senior District Judge, United States District Judge for the Southern District of West Virginia, sitting by designation.

_____

Reversed and remanded by published opinion.  Judge Harris wrote the opinion, in which Judge Gregory and Judge Faber joined.

_____

**ARGUED:**  Joshua Britt, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant.  Maurice Scott Fisher, Jr., HARMAN CLAYTOR CORRIGAN WELLMAN, Glen Allen, Virginia, for Appellees.  Jonathan Backer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.  **ON BRIEF:** Richard B. Katskee, Moksh Gudala, Jake Sherman, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant.  Brian P. Ettari, HARMAN CLAYTOR CORRIGAN WELLMAN, Richmond, Virginia, for Appellees.  Kristen Clarke, Assistant Attorney General, Tovah R. Calderon, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, Richmond, Virginia, Steven Gordon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Amicus Curiae.

_____

PAMELA HARRIS, Circuit Judge:

Rashad Matthew Riddick is involuntarily committed to Central State Hospital, a state-run psychiatric facility in Petersburg, Virginia. Alleging that he was immobilized in four-point restraints for two weeks and then placed in seclusion for a year and a half, Riddick filed a civil rights lawsuit against the hospital's director and the interim commissioner for the state's Department of Behavioral Health and Developmental Services. The district court dismissed Riddick's pro se complaint, reasoning that he did not adequately plead the professional standard of care from which his treatment allegedly departed or the commissioner's personal involvement in his conditions of confinement.

We conclude that plaintiffs like Riddick are not required at the pleading stage to identify an accepted professional standard governing their care. Instead, the requisite departure from professional judgment may be inferred from a plaintiff's specific factual allegations. Because Riddick has alleged facts suggesting that both defendants departed substantially from professional judgment in connection with his conditions of confinement, we reverse the district court's dismissal of his complaint and remand for further proceedings.

**I.**

**A.**

While involuntarily committed at Central State Hospital in January 2018, Riddick was advised by hospital staff that he would be placed in four-point restraints indefinitely.[1] He remained in these restraints – which he deemed a "permanent stress position" – for two weeks, during which he was prohibited from going to group treatment sessions, religious services, the gym, or the law library. When he showered, he was only permitted to remove one arm at a time from his restraints.

While restrained, Riddick filed a complaint with the hospital, contending that he was improperly placed in restraints even though he "did not physically assault anyone, [or] harm [him]self or others." *See* J.A. 92. According to Riddick, his prolonged restraint violated state regulations governing the use of restraint and seclusion in state-run hospitals. Under those regulations, "[e]ach individual is entitled to be completely free from any unnecessary use of seclusion, restraint, or time out." 12 Va. Admin. Code § 35-115-110(A). The regulations also explicitly prohibit the use of seclusion or restraint "as a punishment or reprisal or for the convenience of staff." *Id.* § 35-115-110(C)(4). And critically, the regulations contemplate that seclusion and restraint will be used for no more than four hours at a time: "Providers shall limit each approval for restraint for behavioral purposes or seclusion to four hours for individuals age 18 and older" and "shall not issue

---

[1] Because we are reviewing the grant of the defendants' motion to dismiss, we describe the facts as alleged by Riddick in his complaint and its attachments. *See E.I. du Pont de Nemours & Co. v. Kolon Inds., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

standing orders for the use of seclusion or restraint for behavioral purposes." *Id.* §§ 35-115-110(C)(14)-(15).

The response from then-hospital director Rebecca Vauter – one of two remaining defendants in this case – was attached to Riddick's second amended complaint, and it confirmed that Riddick was at the time subject to restraints and "restricted to the ward." J.A. 92-93.  But, Vauter explained, the hospital was not required to meet the regulatory standards identified by Riddick because it had sought an exemption under § 35-115-10 of the same regulatory chapter.  *See* 12 Va. Admin. Code § 35-115-10(D).  That provision allows for the issuance of an exemption by the commissioner of the Virginia Department of Behavioral Health and Developmental Services – at the time, interim commissioner Jack Barber, the other defendant in this case – excepting a patient from the protections otherwise provided by the regulations.  *Id.*  The exemption must be "in writing and based solely on the need to protect individuals receiving services, employees, or the general public."  *Id.*  In addition, exemptions "shall be time limited" and may not compromise the provision of services.  *Id.*  According to Vauter, the exemption permitted the hospital to put Riddick "in seclusion or restraint any time there is concern . . . that [he] could become aggressive[.]" J.A. 92.[2]

Riddick's response to Vauter – a letter also attached to his operative complaint – contended that any purported exemption would be invalid.  This was so, Riddick said,

---

[2] The parties and the district court alike understand Vauter's letter to signify both that an exemption was "sought," J.A. 92, and that one was granted.  We agree.  The letter itself indicates as much, with Vauter explaining the circumstances under which Riddick could be restrained or secluded "[b]ased on the exemption."  J.A. 92.

because he had not been physically aggressive, because his access to services was being hindered, and because Vauter had not "set a time limit" for the exemption or shown that it had been provided in writing. J.A. 95-97.

The next day, Riddick, freed of his restraints, was moved to seclusion in an empty ward of the hospital. He remained there for 577 days – over a year and a half – with no physical human contact. Riddick could not attend church services or treatment groups, and he was not permitted outside recreation for a year. He received food through a slot on the nurse's station window, and staff were not permitted to be around him on the ward. Riddick could not see the staff observing him from outside the ward: The nurses' station window had been converted to a two-way mirror so that he could not see outside. Because of this isolation, Riddick "experienced gross hallucinations . . . talked to himself a lot, and experienced long periods of depression where [he] stopped eating." J.A. 86. Since his release from seclusion, he "has been in a state of chronic hyper-vigilance." J.A. 89.

**B.**

While in seclusion, Riddick sued Vauter, Barber, and other state officials under 42 U.S.C. § 1983, claiming in relevant part that they had violated his right to be free from unreasonable restraint under the Fourteenth Amendment. After defendants filed multiple motions to dismiss his first amended complaint, Riddick filed a response and moved for appointment of counsel due to his deteriorating mental health.

The district court dismissed the Fourteenth Amendment counts without prejudice for failure to state a claim under Rule 12(b)(6). *See Riddick v. Barber*, No. 3:19-cv-00071-DJN, 2019 WL 6119715 (E.D. Va. Nov. 18, 2019) (*Riddick I*). As to Barber, it concluded

6

that Riddick had not adequately alleged the interim commissioner's personal participation in the asserted violations. Riddick had, by contrast, adequately pleaded Vauter's personal involvement. But as to Vauter, the court found, Riddick had not alleged the facts necessary to state a Fourteenth Amendment claim under the "professional judgment" rule of *Youngberg v. Romeo*, 457 U.S. 307 (1982). Under *Youngberg*, the court explained, a mental health professional may be held liable only if her decision is a sufficiently "substantial departure from the accepted professional judgment, practice, or standards." *Riddick I*, 2019 WL 6119715 at *8 (quoting *Youngberg*, 457 U.S. at 322). And here, the court reasoned, Riddick had failed at the threshold to "identify the accepted professional standard." *Id.* at *10. Nor, as would seem to follow, had Riddick pleaded facts tending to demonstrate a "substantial or shocking" departure from such a standard. *Id.* Finally, relying on Riddick's "impressive ability to respond to the Court's orders and file timely and organized pleadings," the court found that no extraordinary circumstances warranted the appointment of counsel. *Id.*

After an appeal to this court was dismissed on finality grounds, *see Riddick v. Barber*, 822 F. App'x 200 (4th Cir. 2020) (per curiam) (*Riddick II*), Riddick filed the now-operative second amended complaint. Riddick now identified as the relevant professional standard against which to measure his *Youngberg* claim the Virginia regulations limiting restraint and seclusion to four hours and prohibiting standing orders. According to Riddick's complaint, those provisions "clearly identified a protected liberty interest in avoiding" two weeks of restraint and 577 days of seclusion. J.A. 87-88.

7

When the defendants again moved to dismiss, Riddick renewed his request for appointment of counsel, stating that the USB drive containing his legal materials had been confiscated and that he was unable to respond to the defendants' motion. After the district court again denied his request for counsel, Riddick asked that his previous response brief be reincorporated as an opposition to the defendants' latest motion, given his inability to prepare a new, timely filing after receiving notice of the court's directive on the day his response was due. The district court agreed to do so.

Riddick's second amended complaint was met with no more success than his first. *See Riddick v. Barber*, No. 3:19-cv-00071-DJN, 2021 WL 1651229 (E.D. Va. Apr. 27, 2021) (*Riddick III*). As to Vauter, Riddick had "again failed to adequately allege facts showing that [she] deviated from the accepted professional standard." *Id.* at \*6. It was still the case, the court held, that Riddick had "not stated any facts that identify the accepted professional standard." *Id.* Riddick's reliance on Virginia's detailed regulations regarding seclusion and restraint added nothing, in the court's view, because exemptions were permitted, and Riddick had not alleged that Vauter "contravened acceptable professional judgment in seeking an exemption." *Id.* And as to Barber, the court once more concluded that Riddick failed to put forth facts showing the former interim commissioner's personal involvement. *Id.* at \*5. Accordingly, the district court dismissed Riddick's complaint with prejudice. *Id.* at \*6.

Riddick timely appealed.[3]

## II.

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6). *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017). In doing so, we consider not only the complaint itself, but also "documents attached or incorporated into the complaint," *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) – most important here, the letter from Vauter and Riddick's response, both attached to Riddick's complaint, and the Virginia regulations incorporated by reference. And we "liberally construe" Riddick's complaint because it is pro se. *Matherly*, 859 F.3d at 274 (internal quotation marks omitted).

With that as background, we "accept as true all well-pleaded facts" in Riddick's complaint and exhibits "and construe them in the light most favorable" to him, asking only whether Riddick has put forward a facially plausible claim. *See id*. Because Riddick has sufficiently pleaded that Vauter and Barber violated his Fourteenth Amendment rights under this standard, we reverse the district court's dismissal of Riddick's complaint and remand for further proceedings.

---

[3] The court appointed as counsel for Riddick's appeal Assistant Clinical Professor Richard B. Katskee, director of the Duke University School of Law Appellate Litigation Clinic. We appreciate the able assistance of counsel and the clinic students in this matter.

## A.

The Supreme Court established the framework governing Riddick's claims in *Youngberg v. Romeo*, 457 U.S. 307 (1982). *Youngberg* recognizes that the Fourteenth Amendment's Due Process Clause protects an involuntarily committed patient's interests in safe conditions and freedom from bodily restraint. *Id.* at 315-16. But those rights are not "absolute," and must be balanced against competing state interests, including the interest in restraining committed persons to protect them and others from violence. *Id.* at 319-21.

*Youngberg*'s key holding is that in the civil commitment context, the proper balance is achieved by ensuring "professional judgment in fact was exercised" when challenged conditions were established or restraints imposed. *Id.* at 321 (internal quotation marks omitted). Under *Youngberg*, a decision made by a qualified professional is "presumptively valid." *Id.* at 323. But that presumption is overcome, and the Fourteenth Amendment violated, if a professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

*Youngberg*'s professional judgment standard is more protective than the Eighth Amendment "deliberate indifference" standard for conditions-of-confinement claims by incarcerated persons. *See Farmer v. Brennan*, 511 U.S. 825, 835-40 (1994) (outlining Eighth Amendment standard for such claims). The "involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22. So

10

while *Youngberg* requires "more than negligence," it establishes a "lower standard of culpability compared to the Eighth Amendment standard for deliberate indifference" – an "objective standard" that "does not require proof of [an institutional official's] subjective intent." *Doe 4 v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 342-43 (4th Cir. 2021) (internal quotation marks omitted).

In granting the defendants' motion to dismiss, the district court recognized *Youngberg* as the governing precedent and correctly described its professional judgment rule. *Riddick III*, 2021 WL 1651229 at *5. Where the district court went wrong, in our view, was in holding that Riddick could not state a claim under *Youngberg* unless he first identified, at the pleading stage, the "accepted professional standard" from which his conditions substantially departed. *Id.* at *6. We agree with Riddick, joined by the United States as *amicus curiae* on appeal, that a plaintiff need not articulate a professional standard of care at this early stage of litigation. Instead, a plaintiff may survive a Rule 12(b)(6) motion to dismiss by pleading facts regarding his treatment from which it may be reasonably inferred that such treatment fell substantially outside the professional standard of care and the bounds of professional judgment.

By dismissing Riddick's complaint for failing to "identify the accepted professional standard" for restraints and seclusion in the civil-commitment context, *id.*, the district court imposed a requirement supported by neither ordinary pleading standards nor *Youngberg* itself. A motion to dismiss under Rule 12(b)(6) tests only the sufficiency of a complaint; it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v.*

11

*City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  At this preliminary stage, Riddick need only plead "enough facts to state a claim [to] relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  And that standard is met if a complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The district court misapplied this plausibility standard by failing to recognize that even if a complaint does not set forth the particulars of the relevant standard of care, allegations regarding a plaintiff's own treatment may still give rise to a reasonable inference that no professional judgment was exercised.

To ultimately succeed on his *Youngberg* claim, of course, Riddick will be required to establish that the challenged conduct was a "substantial departure from accepted professional judgment." 457 U.S. at 323.  But the Supreme Court in *Youngberg* recognized that "expert testimony . . . may be relevant" in establishing the contours of the baseline "requisite professional judgment."  *Id.* at 323 n.31.  What constitutes the relevant professional norm can be a difficult factual question; as the Ninth Circuit has explained, there is no "'golden code' of professional conduct" that courts – or plaintiffs – can easily turn to regarding *Youngberg* claims.  *Ammons v. Washington Dep't of Social & Health Servs.*, 648 F.3d 1020, 1034 n.15 (9th Cir. 2011).  To the contrary, determining the appropriate standard of care can require "additional facts, expert testimony, and a host of other evidence."  *Id.*  Plaintiffs – and especially pro se plaintiffs like Riddick – typically will not have access to such evidence unless their claims can advance beyond the pleading stage to discovery.  What they likely will have access to is the nature of their own

12

conditions of confinement, and where a substantial departure from professional norms can be inferred from those conditions as alleged, their complaints survive a Rule 12(b)(6) motion to dismiss.

In their brief, the defendants suggested that they now agree on this point, and at oral argument they confirmed their position that a *Youngberg* plaintiff need not plead the content of a specific professional standard to survive a motion to dismiss.  So instead of asking us to adopt the district court's rationale, the defendants ask us to affirm on a different ground, arguing that Riddick's complaint does not set out facts from which a *Youngberg* violation could be inferred.  We disagree.  Reading Riddick's pro se complaint generously and applying our "judicial experience and common sense," *see Iqbal*, 556 U.S. at 679, we may reasonably infer that there was a substantial departure from professional judgment in connection with Riddick's conditions of confinement.

First and most important, there is the length of time Riddick alleges he was subjected to restraints and then seclusion.  If Riddick's allegations are believed – and in this posture, we accept them as true, *see Matherly*, 859 F.3d at 274 – then he was held in four-point restraints, or a "permanent stress position," J.A. 85, for a full two weeks and then in "total isolation" with "absolutely no physical human contact" for 577 days, or a bit over a year and half, J.A. 86.  And in considering whether these extreme time periods give rise to an inference that there has been a departure from professional standards, we even have a point of comparison:  the four-hour maximum contemplated by the Virginia regulations, as incorporated in Riddick's complaint.  *See* 12 Va. Admin. Code § 35-115-110(C)(14) ("Providers shall limit each approval for restraint for behavioral purposes or seclusion to

13

four hours[.]"). That regulatory baseline was exceeded here by orders of magnitude so great that it is reasonable to infer a complete abdication of professional judgment.

We take as true, as the defendants emphasize, that interim commissioner Barber granted Vauter an exemption from the four-hour rule. But that does not make the regulatory default irrelevant to the professional judgment inquiry. The point of the *Youngberg* rule is to "prevent a judge or jury from using 'unguided discretion'" in assessing treatment protocols. *Thomas S. v. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990) (quoting *Youngberg*, 457 U.S. at 321). But we need not rely on our own discretion or intuitions in evaluating the duration of Riddick's restraint and seclusion. Instead, we have as a reference point an official state policy reflecting a professional norm that for the civilly committed, restraint or seclusion of over four hours will in most cases be unwarranted and counterproductive. *Cf. Thomas S.*, 902 F.2d at 252 (relying in part on state agency written policy to identify accepted professional standard).[4] Against this baseline, allegations that a patient has been held in restraints for 84 times longer than recommended, and in seclusion for *3,462* times longer, can plausibly suggest a substantial – indeed, dramatic – departure from acceptable professional practice.

That reasonable inference is bolstered by the complaint's other allegations. First, Riddick alleges that his extended isolation caused his mental health to deteriorate, leading

---

[4] Virginia is no outlier. The United States and every state in our circuit place general limits on how long restraint and seclusion can be ordered for involuntarily committed individuals. *See* 42 C.F.R. § 482.13(e) (United States); Md. Code Regs. §§ 10.21.12.09, 10.21.13.07 (Maryland); 10A N.C. Admin. Code § 28D.0206 (North Carolina); S.C. Code § 44-22-150 (South Carolina); W. Va. Code R. § 64-59-10 (West Virginia).

14

to "gross hallucinations" and "long periods of depression" during which he stopped eating. J.A. 86. Riddick was at the time, as he is today, involuntarily hospitalized due to his mental illness. In considering whether exceeding the presumptive four-hour maximum by a factor of 3,462 for such a patient can support an inference of a substantial departure from professional judgment, we reasonably could take account of the effects on Riddick himself. Moreover, Riddick alleges that he spent over a year and a half in seclusion pursuant to a "standing order," in violation of Virginia regulations, *see* 12 Va. Admin. Code § 35-115-110(C) (prohibiting "standing orders" for the use of seclusion or restraint for behavioral purposes), with or without an exemption, *see id.* § 35-115-10(D) (requiring that exemptions be "time limited"). From this, too, one could reasonably infer that Riddick's 577 days in isolation was not tailored to his personal circumstances or to an appropriate professional standard.

We recognize that in some circumstances, professional judgment may sanction certain uses of restraint or seclusion to "provide reasonable safety for all residents and personnel" within a hospital. *See Youngberg*, 457 U.S. at 324. But at least as alleged, that is not this case. According to Riddick, he did not physically assault or otherwise harm himself or others before he was placed in restraints and then seclusion. And when Riddick said as much in an administrative complaint, the hospital did not dispute his allegation but instead explained that its regulatory exemption allowed Riddick to be restrained or isolated based on "a concern that [he] *could* become aggressive" in the future. J.A. 92 (emphasis added). A court could reasonably infer that the imposition of the severe conditions of confinement alleged here – including, again, a full year and a half of seclusion – is

15

inconsistent with accepted standards of care, and particularly so where it is based only on hypothesized *future* aggression.

To be clear, we do not hold that every deviation from a state regulation like § 35-115-110(C) will violate the due process rights of a civilly committed patient, or even give rise to an inference of a substantial departure from accepted professional judgment. The defendants are correct that a violation of state law is not the same thing as a Fourteenth Amendment violation, *cf. Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) (violating state law does not necessarily violate Fourteenth Amendment right to procedural due process), and under *Youngberg*, we always owe very substantial deference to "decisions made by the appropriate professional," *see* 457 U.S. at 324. In this case, however, the extreme departures from the presumptive four-hour limit alleged by Riddick, taken together with Riddick's other allegations, more than justify an inference that the defendants acted "so completely out of professional bounds as to make [their decision] explicable only as an arbitrary, nonprofessional one." *Doe 4*, 985 F.3d at 343 (quoting *Patten v. Nichols*, 274 F.3d 829, 845 (4th Cir. 2001)). That is enough for Riddick's complaint to survive a motion to dismiss. Whether the defendants' actions were in fact "substantial departure[s] from the requisite professional judgment," *Youngberg*, 457 U.S. at 323 n.31, is properly determined at a later stage with the aid of discovery and expert testimony.

The defendants raise two primary arguments to the contrary, but we find neither persuasive. First, the defendants, echoed by the district court, insist that because this case apparently involves an exemption from the relevant regulations, Riddick can state a

16

*Youngberg* claim only if he alleges that Vauter contravened accepted professional standards in seeking an exemption at all. *See Riddick III*, 2021 WL 1651229 at \*6. But the question under *Youngberg* is not whether *any* departure from the four-hour limit could have been sought by Vauter or granted by Barber consistent with professional judgment. What matters is whether the *actual conditions* alleged by Riddick – the two weeks locked in restraints and the 577 days of social isolation – fall within the broad bounds of accepted practice, regardless of any exemption purporting to authorize them. Were it otherwise, *Youngberg*'s presumption of validity would become an iron-clad rule, with officials able to shield themselves from liability for even the most extreme conditions of confinement so long as they first obtained an administrative sign-off.

The defendants also argue that Riddick's factual allegations about his restraint and seclusion are inconsistent and belied by the exhibits he attached to his complaint, rendering his claims implausible. But we see no conflict or inconsistency warranting dismissal of Riddick's complaint. The fact that Riddick was permitted to shower with a single limb free, for instance, does not substantively undermine his description of his restraint. Nor does Riddick's seeming ability to write a letter and file notarized legal documents appreciably subtract from his allegations regarding his year and a half in seclusion. The defendants are of course free to contest Riddick's allegations and the severity of his treatment as this case moves on from the pleading stage. But viewing the alleged facts "in the light most favorable to the plaintiff," *Matherly*, 859 F.3d at 274, we conclude that Riddick has plausibly alleged a constitutional violation.

17

**B.**

The district court dismissed Riddick's claims against Barber, then the interim commissioner for the Virginia Department of Behavioral Health and Developmental Services, on a different ground, finding that Riddick failed to sufficiently allege Barber's personal participation in the claimed Fourteenth Amendment violations. *Riddick III*, 2021 WL 1651229 at *5. Again, we disagree. Riddick pleaded facts plausibly connecting Barber to his alleged conditions of confinement and constitutional deprivations. That is all that is required at this stage of the proceedings. *See King*, 825 F.3d at 214 (explaining that plaintiff need only plead facts that are "enough to raise a right to relief above the speculative level" (quoting *Twombly*, 550 U.S. at 555)).

It is true, as the district court explained, that to establish § 1983 liability, Riddick "must affirmatively show that the official charged" – here, Barber – "acted personally in the deprivation of [his] rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (cleaned up); *see Riddick III*, 2021 WL 1651229 at *4. But while personal involvement is required, it need not be hands-on. Instead, the "requisite causal connection" between defendant and violation can be established if the defendant "set[s] in motion a series of acts by others which the actor[] know[s] or reasonably should know would cause others to inflict the constitutional injury." *Amisi v. Brooks*, 93 F.4th 659, 670 (4th Cir. 2024) (internal quotation marks omitted); *see* 42 U.S.C. § 1983 (establishing liability for a person who "subjects, or causes to be subjected," another person to a deprivation of constitutional rights).

18

Here, Riddick pleaded facts alleging such personal involvement by Barber in the conditions of which he complains. As for the restraints, Riddick alleges specifically that he was "placed into 4-point restraints indefinitely" at the "directive" of both Barber and Vauter. J.A. 85. And he alleges that he "remained in solitary confinement per written standing order" sought by Vauter and approved by Barber. J.A. 88. Riddick's theory of liability, in other words, is a match with § 1983: According to Riddick, Barber caused him to be subjected to the unconstitutional conditions at issue by authorizing exemptions that put him in restraints for two weeks and in seclusion for a year and a half.

The defendants argue primarily that this allegation is too conclusory to survive review under Rule 12(b)(6). But the Vauter letter attached to Riddick's complaint relies on an exemption – one that purportedly authorizes seclusion or restraint "any time there is concern" that Riddick "could become aggressive," J.A. 92 – and the defendants themselves have made that apparent exemption the centerpiece of their case. And crucially, the Virginia regulations on which Riddick relies make clear that such an exemption could have been granted by only one person: Barber, the interim commissioner. 12 Va. Admin. Code § 35-115-10(D). Once the district court assumed that there *was* an exemption and that it was relied on in connection with Riddick's treatment, *see Riddick III*, 2021 WL 1651229 at *6, it necessarily resolved the matter of Barber's personal involvement for purposes of this motion to dismiss.

We emphasize again that we are at a very early stage of this litigation. Perhaps discovery will show that there was no exemption, notwithstanding the Vauter letter. Or perhaps there was an exemption but not one that authorized the actual conditions alleged

19

by Riddick, so that Barber would have had no reason to anticipate the prolonged restraint and seclusion at issue. *See Amisi*, 93 F.4th at 670 (explaining § 1983 liability for setting in motion acts by others which the defendant "know[s] or reasonably should know" will result in constitutional injury). It may become clear at some later stage, in other words, that Vauter alone is responsible for any *Youngberg* violation and that Barber did not have the requisite personal involvement in Riddick's treatment. But at this point in the proceedings, in alleging that Barber approved the standing order authorizing the actions of which he complains, Riddick has adequately alleged Barber's personal involvement, and the district court erred in dismissing the complaint against him.[5]

---

[5] The defendants also briefly argue that we may affirm the dismissal of Riddick's complaint on a ground the district court expressly declined to address: that they are entitled to qualified immunity. Qualified immunity defenses are "usually not successful" at this early stage in the proceedings, where plaintiffs must present only "a claim that is *plausible* on its face." *Owens v. Balt. City State's Atty's Off.*, 767 F.3d 379, 396 (4th Cir. 2014) (internal quotation marks omitted). Instead, qualified immunity typically is best addressed "at the summary judgment stage after the facts have been developed through discovery." *Alford v. Cumberland Cnty.*, No. 06-1569, 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2017); *see also Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (explaining that the time to decide qualified immunity "is usually summary judgment and not dismissal under Rule 12"). This case does not appear to be an exception; whether the defendants violated clearly established law will turn at least in part on whether, as plausibly alleged, the defendants substantially departed from accepted professional judgment in restraining and secluding Riddick. *See Thomas S.*, 902 F.2d at 252 (relying on substantial departure from accepted professional standards governing the use of restraint and seclusion to find a *Youngberg* violation). In any event, we are "a court of review, not of first view," *Pendleton v. Jividen*, 96 F.4th 652, 658 (4th Cir. 2024) (internal quotation marks omitted), and we leave resolution of this issue to the district court as the case goes forward.

**III.**

Given our holding that Riddick's complaint survives a Rule 12(b)(6) motion to dismiss, the final issue before us is whether Riddick should be appointed counsel as his case moves forward. Our review of the circumstances surrounding Riddick's case leads us to recommend that the district court appoint counsel for the later stages of this litigation.

Though Riddick's briefing focuses primarily on the need for counsel going forward, the district court's prior rulings on the counsel issue provide important context. Riddick twice requested appointed counsel to represent him before the district court – first on the ground that his deteriorating mental health rendered him incapable of representing himself, and then because a lack of resources at Central State Hospital made it impossible for him to conduct legal research. Regarding Riddick's capacity to represent himself, the district court was unconvinced counsel was warranted given Riddick's "impressive ability to respond to the Court's orders and file timely and organized pleadings." *Riddick I*, 2019 WL 6119715 at *10. And when denying appointed counsel for the second time, the district court explained that Riddick's claims were not sufficiently complex to require the assistance of appointed counsel.

Whether to appoint counsel for indigent plaintiffs in civil cases falls within the discretion of district courts. However, "it is an abuse of discretion to decline to appoint counsel where the case of an indigent plaintiff presents exceptional circumstances." *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989). Whether such circumstances exist depends on "the type and complexity of the case, and the abilities of the individuals bringing it."

21

*Id.* (internal quotation marks omitted). Courts should appoint counsel "[i]f it is apparent . . . that a pro se litigant has a colorable claim but lacks the capacity to present it." *Evans v. Kuplinski*, 713 F. App'x 167, 170 (4th Cir. 2017) (quoting *Whisenant*, 739 F.2d at 163).

In *Evans*, we reversed the denial of appointed counsel to a different patient at the same state hospital where Riddick is committed, Virginia's Central State Hospital. We recognized that a pro se plaintiff "does not have a general right to counsel in a § 1983 action," and that the decision to appoint counsel is discretionary. *Id.* But we found that denial of counsel in that case was an abuse of discretion, based in part on the plaintiff's "characteristics and capabilities," which mirror Riddick's: Like Riddick, the *Evans* plaintiff "suffer[ed] from severe mental illness," and like Riddick, his commitment to Central State – a psychiatric hospital, not a prison – meant that he had no access to a law library in which to conduct legal research. *Id.* at 171.[6]

The defendants distinguish *Evans* by noting, correctly, that *Evans* involved a decision at summary judgment. By contrast, the defendants explain, at the time he moved for appointment of counsel, Riddick needed only to meet the generous Rule 12(b)(6) standard to survive a motion to dismiss, setting forth sufficient factual allegations to state a plausible claim for relief, and had no need to conduct discovery or advance extensive legal arguments. But as the defendants themselves recognize, citing *Eagan v. Dempsey*,

---

[6] The defendants note that despite the lack of a law library, Riddick – apparently unlike the plaintiff in *Evans* – had access to relevant case law on a USB drive. But according to Riddick, that USB drive has been confiscated, leaving him entirely unable to respond to the defendants' second motion to dismiss. *See Riddick III*, 2021 WL 1651229 at *1 n.2 (instead incorporating Riddick's response to a different motion to dismiss).

22

987 F.3d 667 (7th Cir. 2021), the need for counsel becomes significantly more pressing when litigation continues past the pleading stage, as discovery commences, expert witnesses are retained, and trial preparation begins. *See Eagan*, 987 F.3d at 683 (recognizing that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation" (internal quotation marks omitted)).

Regardless of whether counsel should have been appointed earlier – a question we do not decide in light of our reversal of the dismissal of Riddick's complaint, *see Brooks v. Johnson*, 924 F.3d 104, 122 n.9 (4th Cir. 2019) – this case appears to call for the appointment of counsel as it moves forward, *see Shaw v. Foreman*, 59 F.4th 121, 132 (4th Cir. 2023) (reversing dismissal of claim and pre-discovery grant of summary judgment of another claim while "recommend[ing] that the district court appoint counsel" on remand); *Brooks*, 924 F.3d at 122 n.9 (finding appointment question moot after vacating grant of summary judgment and suggesting on remand "that the court consider appointing counsel for [the plaintiff] to assist in litigating the case"). Riddick remains committed at Central State due to mental illness, where he lacks access to the defendants, to legal research resources and databases, and to potential witnesses. And at least as the defendants understand the case, much will turn on the nature of any exemption granted to Vauter by Barber – information that will be available to Riddick only if he can obtain the purported exemption in discovery or depose Vauter, Barber, and possibly other state employees. Given that reality, as the defendants emphasize, it will be up to Riddick at future stages of litigation to identify the accepted professional standards against which to judge his *Youngberg* claims, a complex undertaking that may well require expert testimony. *See*

23

*Whisenant*, 739 F.2d at 163; *Eagan*, 987 F.3d at 683 (emphasizing, in context of appointment of counsel, the complexity of cases requiring plaintiffs to prove a substantial departure from accepted professional judgment).  Under all the circumstances here, we think it would be most prudent for Riddick to be represented by counsel for the remainder of this litigation, and we therefore recommend that the district court appoint counsel for him consistent with local rules and procedures.

## IV.

For the foregoing reasons, we reverse the district court's dismissal of Riddick's second amended complaint and remand for further proceedings.

*REVERSED AND REMANDED*